# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

**ISAIAS VASQUEZ and LINDA HEFKE,**

**Plaintiffs,**

v.

**LEPRINO FOODS COMPANY and LEPRINO FOODS DAIRY PRODUCTS COMPANY,**

**Defendants.**

**CASE NO. 1:17-cv-00796-AWI-BAM**

**ORDER GRANTING, IN PART, AND DENYING, IN PART, PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

(Doc. No. 116)

## I.  Introduction

In this lawsuit, two cheese manufacturing companies are being sued by two of their employees for violating California's wage-and-hour laws.  The two employees are Isaias Vasquez and Linda Hefke (collectively "Plaintiffs").  The two cheese manufacturing companies are Leprino Foods Company and Leprino Foods Dairy Products Company (collectively "Defendants" or "Leprino").[1]

Now before the Court is Plaintiffs' motion for class certification pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.  See Doc. No. 116.  For the reasons discussed herein, Plaintiffs' certification motion will be granted, in part, and denied, in part.

## II.  Facts

According to the Court's review of the parties' class certification briefing and evidence, the facts for purposes of adjudicating the certification motion are as follows.  See In re Hydrogen Peroxide Antitrust Litigation, 552 F.3d 305, 313 (3d Cir. 2008) ("Although the district court's findings for the purpose of class certification are conclusive on that topic, they do not bind the fact-finder on the merits.") (emphasis added).

---

[1]  In their class certification briefing, the parties, including both defendants, make no distinction between, on one hand, Leprino Foods Company and, on the other hand, Leprino Foods Dairy Products Company.  Rather, the parties treat both defendants as if they are a single entity, which the parties refer to as "Leprino."  Accordingly, the Court will adopt that practice in this order.

**1.** **Lemoore West facility: Approximately 900 nonexempt, hourly employees and 8 departments.**

Leprino manufactures and processes cheese and dairy-ingredient products. Leprino has nine manufacturing plants in the United States, including the Lemoore West facility, which is in Lemoore, California and operates twenty-four hours a day, seven days a week. Plaintiffs' causes of action and certification motion concern only Leprino's activities at the Lemoore West facility, not any other facility. At Lemoore West, Leprino has approximately 108 nonexempt, hourly-worker positions, and Leprino employs about 906 individuals to fill those positions.

Leprino has eight departments at Lemoore West: Cheese, Nutrition (also called Whey), Processing, Quality, Warehouse, Maintenance, Human Resources, and Administration. Each department is responsible for a different process or function. The Cheese Department has 263 nonexempt, hourly employees and is responsible for turning milk into cheese products. The Processing Department has approximately 243 hourly, nonexempt employees and converts cheese formats (slices, dices and shreds) into packaged products, which can be fresh or frozen. The Nutrition Department (formerly called the Whey Department) has approximately 92 hourly, nonexempt employees and converts (filters, condenses, and dries) skim whey left over from the Cheese Department into powder. The Administration Department has approximately 12 hourly, nonexempt employees and handles payroll, AP, financials, budgets, production accounting, and "Continuous Improvement." The Warehouse Department has approximately 87 hourly, nonexempt employees and receives, moves, stores and ships ingredients and finished goods. The Maintenance Department has approximately 110 hourly, nonexempt employees and installs, repairs, and maintains all equipment in the facility, as well as handles waste treatment and power concerns. The Quality Department has approximately 94 hourly, nonexempt employees and performs quality checks on all processes and conducts final product testing. The Human Resources Department has approximately five hourly, nonexempt employees and handles all employee relations matters, including employment policies, leaves, recruiting, discipline, and safety activities. Each department has an overall director or manager who oversees the department, and depending on the size of the department, responsibility is divided among additional managers, senior supervisors, regular supervisors, and hourly group leaders.

## 2. Leprino's official written meal and rest break policies.

During the proposed class period, Leprino had an official written meal and rest break policy that applied universally to nonexempt employees at Lemoore West. As for meal breaks, in Leprino's older employee handbooks (dated May 1, 2013, April 1, 2015, and March 14, 2017), the meal break policy states as follows:

> Duty-free Meal Breaks: Employees are **required** to take a 30 minute unpaid duty-free meal break prior to the end of the 5th hour of work. . . . During a meal break, employees are relieved of all duties and are free to leave the facility.

(Emphasis in original.). In Leprino's current employee handbook (dated October 16, 2017), the meal break policy states as follows:

> Duty-free Meal Breaks: Employees are required to take a 30 minute unpaid duty-free meal break prior to the end of the 5th hour of work. . . .
>
> During a meal break, employees are relieved of all duties and are free to leave the facility.

As for rest breaks, in the older employee handbooks (dated May 1, 2013, and April 1, 2015), the rest break policy states as follows:

> Rest Breaks: Employees will be provided with one (1) 15-minute paid rest break when they work between 3 1/2 and 6 hours, and a second 15-minute paid rest break when they work between 6 and 10 hours, and a third 15 minute paid rest break when they work between 10 and 14 hours.

In the other older-but-less-old employee handbook (dated March 14, 2017), the rest break policy remained identical to the previous versions, with the exception of extending the length of the paid rest breaks to twenty minutes, and states as follows:

> Rest Breaks: Employees will be provided with one (1) 20-minute paid rest break when they work between 3 14 and 6 hours, and a second 20-minute paid rest break when they work between 6 and 10 hours, and a third 20 minute paid rest break when they work between 10 and 14 hours.

In the current employee handbook (dated October 16, 2017), the rest break policy states as follows:

> Rest Breaks: The Company authorizes and permits employees
> working at least 3 1/2 hours in a day to take a 20-minute, off-duty
> paid rest period for each four hours worked or major fraction
> thereof Employees will be provided with one (1) 20-minute paid
> rest break when they work between 3 1/2 and 6 hours, and a second
> 20-minute paid rest break when they work between 6 and 10 hours,
> and a third 20-minute paid rest break when they work between 10
> and 14 hours.

Since at least 2013, Leprino posted a memorandum by a time clock, which states:

"Employees are required to take a 30-minute unpaid duty-free meal break prior to the end of the

5th hour of work." Additionally, "[f]or many years," Leprino posted a sign above "the time

clocks," (Decl. Kes Anderson), which states: "EMPLOYEES ARE EXPECTED TO TAKE A 30

MINUTE LUNCH BREAK RELIEVED OF ALL DUTY." In January 2019, which is

approximately one-and-a-half years after Plaintiffs filed this lawsuit, Leprino replaced the

previous sign with a new sign, which states:

> Employees are expected to take a 30 minute lunch break <u>relieved of
> all duty</u>. Any employee unable to take a full 30 minute duty free
> meal break because they are required to come back to work early
> <u>must notify their supervisor immediately</u>.
>
> Employees are not required to have their 2-way radio on during
> meal or rest breaks.

(Emphasis in original.).

When new employees started working for Leprino at Lemoore West, Leprino has the

employees attend a multi-day orientation, during which Leprino reviews with the employees the

meal and rest break policies. Additionally, Leprino distributes and makes available to the

employees the employee handbook as new versions are created.

**<u>3.</u>     <u>Quality standards, "over communication recommendation," production goals,
carrying out instructions.</u>**

As a matter of facility-wide policy, Leprino emphasizes "quality" at Lemoore West.

Leprino trains its employees on the importance of quality in their work and production. As a

matter of facility-wide policy, Leprino's supervisors are supposed to have ongoing discussions

with employees about the importance of quality. Leprino painted the word "quality" on the steps

at the entrance of the Lemoore West facility.

4

As a matter of facility-wide policy or "recommendation," Leprino trains its employees to "over communicate" about work-related matters with fellow employees "so that [workers] can prevent problems before they happen." Depo. Kes Andersen.

Leprino imposes production goals and quotas. Meeting these goals and quotas requires, amongst other things, machinery to function properly. Therefore, employees who work with machinery must constantly monitor and/or maintain the machinery so that production goals and quotas are not frustrated. The employee handbook states that "[u]nnecessary delay of production or operation of equipment" is "prohibited conduct." Employees are held accountable and even disciplined for failure to perform their duties and meet quotas, according to multiple employees. See, e.g., Decl.'s (1) Steve Fish, (2) Steven Funk, (3) Ray Lopez, (4) Jose Loza, (5) Jose Martinez, (6) Jerry Covert, (7) Tom Benedict. See also Decl. (8) George Austin (repeatedly told during training that "time is of the essence"). Some employees are regularly prevented from taking scheduled breaks because their duties require them to stay on the job, according to several employees. See Decl.'s (1) Sergio de la Torre, (2) Daniel Guttierez, (3) Ray Lopez, (4) Jose Martinez, (5) Janice Perkins, (6) David Villa; Depo. (7) Frederick Williams.

As a matter of facility-wide policy, Leprino tells its employees that they are "required" to "[c]arry out all written and/or verbal directions and instructions" and "refusal to follow a Supervisor's instructions" is "prohibited conduct." Employee handbook.

**4.** **Work-related interruptions during breaks.**

**A.** **Radio.**

Leprino assigned personal radios to several employees, but not all employees. Employees who were assigned a radio were required by Leprino to carry the radio at all times and respond to work-related radio calls at all times, including during meal and rest breaks, according to several employees. See Decl.'s (1) Tom Benedict, (2) Alburt Alvarez, (3) Armindo Calouro, (4) Jamaal Fay, (5) Shelly Gray, (6) Ray Lopez, (7) Jose Loza, (8) Armando Pacheco, (9) Anna Vasquez, (10) Joe Woodward, (11) Linda Hefke, (12) Steve Fish; Depo. (13) Jerry Covert. Employees who were assigned a radio were often contacted on their radios about work-related matters during their meal and rest breaks, according to several employees. See Decl.'s (1) Jamaal Fay, (2) Steve Funk, (3)

Daniel Guttierez, (4) Jose Loza, (5) Armando Pacheco, (6) Frankie Rosa, (7) Anna Vasquez, (8) David Villa, (9) Joe Woodward; Depo.'s (10) Jerry Covert, (11) Tom Benedict, (12) Josh Ramirez, (13) Angel Olivarez, (14) Fredrick Williams, (15) Isais Vasquez.  Employees often observed other employees being contacted on their radios about work-related matters during their meal and rest breaks, according to several employees.  See Decl.'s (1) George Austin, (2) Bobby Barnes, (3) Armindo Calouro, (4) Sergio de la Torre, (5) Steve Funk, (6) Jeremy Hernandez, (7) Ray Lopez, (8) Jose Martinez, (9) Armando Pacheco, (10) Janice Perkins, (11) Kelly Randall, (12) Frankie Rosa, (13) Anna Vasquez, (14) David Villa, (15) Joe Woodward; Depo.'s (16) Tom Benedict, (17) Angel Olivarez, (18) Fredrick Williams.  See also Depo. (19) Kes Anderson (saying he has no reason to dispute an employee's claim that he or she was contacted about a work-related matter during a break).

Before the sign was posted by Leprino in 2019 (i.e., "Employees are not required to have their 2-way radio on during meal or rest breaks"), Leprino did not have a written policy stating that employees did not have to have their radios turned on during breaks.  See Depo. Robert Tuttrup.

**B.** **Intercom.**

Leprino's breakrooms had intercoms.  Employees were often called on the intercom about work-related matters during their meal and rest breaks, according to several employees.  See Decl.'s (1) George Austin, (2) Jamaal Fay, (3) Steve Fish, (4) Armando Pacheco, (5) Kelly Randall; Depo.'s (6) Jerry Covert, (7) Tom Benedict.  Employees often observed other employees being called on the intercom about work-related matters during their meal and rest breaks, according to several employees.  See Decl.'s (1) Alburt Alvarez, (2) George Austin, (3) Sergio de la Torre, (4) Nicole Crain Essepian, (5) Steve Funk, (6) Shelly Gray, (7) Daniel Guttierez, (8) Jeremy Hernandez, (9) Ray Lopez, (10) Jose Loza, (11) Jose Martinez, (12) Armando Pacheco, (13) Kelly Randall, (14) Frankie Rosa, (15) David Villa; Depo.'s (16) Jerry Covert, (17) Josh Ramirez, (18) Angel Olivarez, (19) Fredrick Williams.

### C. Breakroom phone.

Leprino's breakrooms had a work phone. Employees were often called on the work phone about work-related matters during their meal and rest breaks, according to several employees. <u>See</u> Decl.'s (1) Nicole Crain Essepian, (2) Jamaal Fay, (3) Steven Fish, (4) Jeremy Hernandez, (5) Jose Loza, (6) Armando Pacheco, (7) Janice Perkins, (8) David Villa; Depo.'s (9) Jerry Covert, (10) Tom Benedict, (11) Angel Olivarez. Employees often observed other employees being called on the work phone about work-related matters during their meal and rest breaks, according to several employees. <u>See</u> Decl.'s (1) Sergio de la Torre, (2) Daniel Guttierez, (3) Jeremy Hernandez, (4) Armando Pacheco, (5) David Villa; Depo. (6) Jerry Covert.

### D. Cell phone.

Employees were contacted on their personal cell phones about work-related matters during their meal and rest breaks, according to some employees. <u>See</u> Decl.'s (1) Armindo Calouro, (2) Steve Fish, (3) Steve Funk, (4) Daniel Guttierez; Depo. (5) Frederick Williams.

### E. In person.

Employees were contacted in person about work-related matters during their meal and rest breaks, according to several employees. <u>See</u> Decl.'s (1) Alburt Alvarez, (2) George Austin, (3) Gergio de la Torre, (4) Nicole Crain Essepian, (5) Jamaal Fay, (6) Daniel Guttierez, (7) Armando Pacheco, (8) Kelly Randall, (9) Frankie Rosa; Depo.'s (10) Jerry Covert, (11) Tom Benedict. Employees observed other employees being contacted in person about work-related matters during their meal and rest breaks, according to some employees. See Decl.'s (1) Daniel Guttierez, (2) Frankie Rosa, (3) Joe Woodward; Depo. (4) Frederick Williams.

### F. Employees contacting other employees about work-related matters during meal and rest breaks.

Several employees admitted to often contacting other employees about work-related matters during the other employees' meal and rest breaks. <u>See</u> Decl.'s (1) Jamaal Fay, (2) Steve Fish, (3) Steve Funk, (4) Ray Lopez, (5) Jose Loza, (6) David Villa, (7) Joe Woodward; Depo.'s (8) Jerry Covert, (9) Tom Benedict, (10) Josh Ramirez, (11) Angel Olivarez.

**G.      Expectation of availability at all times, including during breaks.**

Employees were told and/or were of the understanding that they were required to respond to work-related interruptions at any time, including during meal and rest breaks, according to several employees.  See Decl.'s (1) Bobby Barnes, (2) Sergio de la Torre, (3) Jamaal Fay, (4) Steve Funk, (5) Ray Lopez, (6) Jose Loza, (7) Courtney Mateos, (8) Armando Pacheco, (9) Kelly Randall, (10) David Villa, (11) Joe Woodward, (12) Steven Fish, (13) Shelly Gray, (14) Daniel Guttierez, (15) Fili Monzon, (16) Anna Vasquez; Depo.'s (17) Isaias Vasquez, (18) Jerry Covert, (19) Tom Benedict, (20) Josh Ramirez, (21) Angel Olivarez, (21) Frederick Williams.

Employees were never trained to not respond to work-related interruptions during meal or rest breaks, according to several employees.  See Decl.'s (1) Jamaal Fay, (2) Frankie Rosa; Depo.'s (3) Frankie Rosa, (4) Robert Tuttrum, (5) Jerry Covert, (6) Tom Benedict, (7) Angel Olivarez, (8) Frederick Williams.

**H.      No pay for interrupted breaks.**

Leprino did not pay employees for breaks that were interrupted with work-related matters, according to several employees.  See Decl.'s (1) Alburt Alvarez, (2) George Austin, (3) Armindo Calouro, (4) Sergio de la Torre, (5) Steve Fish, (6) Steve Funk, (7) Shelly Gray, (8) Daniel Guttierez, (9) Jeremy Hernandez, (10) Ray Lopez, (11) Jose Loza, (12) Jose Martinez, (12) Courtney Mateos, (13) Janice Perkins, (14) Kelly Randall, (15) Anna Vasquez, (16) David Villa, (17) Joe Woodward; Depo.'s (18) Isaias Vasquez, (19) Jerry Covert, (20) Tom Benedict, (21) Josh Ramirez, (22) Frederick Williams.  Leprino did not track if or when employees' breaks were interrupted.  Depo. Robert Tuttrup.

**5.      Work-related calls when off-duty.**

Employees were often called about work-related matters when they were off duty, such as after a shift, and they were not paid for responding to these calls, according to several employees. See Decl.'s (1) Alburt Alvarez, (2) George Austin, (3) Armindo Calouro, (4) Sergio de la Torre, (5) Nicole Crain Essepian, (6) Steve Fish, (7) Steve Funk, (8) Shelly Gray, (9) Jeremy Hernandez, (10) Jose Loza, (11) Courtney Mateos, (12) Kelly Randall, (13) Frankie Rosa, (14) Anna Vasquez, (15) Joe Woodward; Depo.'s (16) Linda Hefke, (17) Isaias Vasquez, (18) Angel Olivarez, (19)

Frederick Williams, (20) Jerry Covert, (21) Tom Benedict.

**6.** **De-crewing and reporting time pay.**

    **A.** **Official written reporting time pay policy.**

During the proposed class period, Leprino had an official written policy for reporting time pay. In an older employee handbook (dated May 1, 2013), the policy stated:

> When an employee is called into work or arrives for a scheduled shift that is cancelled or changed, he/she will be provided with four (4) hours of work or pay or combination thereof. In such cases, a Supervisor may ask for volunteers to go home. Any employee who refuses available work will not be paid.

In another current written policy (effective February 1, 2015), the policy stated:

> California law provides that if an employee is required to report for work and does report, but is not put to work or sent home less than half way into the employee's scheduled shift, the employee shall be paid half of his or her scheduled shift, but in no event less than two hours nor more than four hours at the employee's regular rate of pay.

In the current employee handbook (dated October 16, 2017), the policy stated:

> Nonexempt employees who report to work at the Company's request, but are furnished less than half of their usual or scheduled day's work, will be paid for half the usual or scheduled day's work, but not less than two hours' pay or more than four hours' pay at their regular rate, without regard to the number of hours they actually worked, unless the reasons for the lack of work are beyond the Company's control. Reporting time hours are not counted as "hours worked" for overtime purposes beyond the time in which work actually is performed.
>
> At times, employees will be offered the opportunity to volunteer to go home when a shift does not require all employees to remain. Employees who volunteer may use vacation time to receive pay for any hours they have volunteered to take off. Employees choosing not to volunteer to take the day off will be provided with work, or paid for four hours if sent home by the company.

    **B.** **Involuntarily de-crewing.**

Leprino often overstaffed work shifts, meaning more employees than necessary were scheduled to work a shift. When this occurred, the scheduled employees would arrive to work and then a supervisor would ask the employees for volunteers who did not want to work and, as a result, leave without shift pay (i.e., the employee would be paid for whatever time the employee was at work, but would not be paid a minimum of a four-hour wage for the shift). If not enough

9

employees volunteered to not work, then, according to some employees, the supervisor would on occasion send home selected employees without reporting time pay (i.e., a minimum of a four-hour shift wage).  See Depo.'s (1) Linda Hefke, (2) Marcellino Valdez, (3) Jerry Covert, (4) Angel Olivarez; see also (5) letter from Kes Anderson to Isaias Vasquez (recognizing instances of this happening).  The involuntary selection would often be made based on the employees' seniority. Workers who were selected by the supervisor to go home were involuntarily de-crewed.

**7.** **Plaintiffs' lawsuit and causes of action.**

Plaintiffs filed this lawsuit against Leprino on June 12, 2017.  In their third amended complaint, Doc. No. 61, which is the operative complaint, Plaintiffs plead the following eight causes of action against Leprino in a class representative capacity:

1) Reporting time pay: Leprino failed to pay "reporting time pay" to de-crewed employees in violation of California Industrial Welfare Commission ("IWC") Wage Order No. 8, Cal. Code Regs., tit. 8, § 11080(5).

2) On-call meal and rest breaks: Leprino's policies and practices effectively placed employees on call during meal and rest breaks in violation of Cal. Lab. Code §§ 226.7, 512 and Wage Order 8.

3) Itemized wage statements: Leprino failed to furnish properly itemized wage statements to its employees in violation of Cal. Lab. Code §§ 226(a) and 226(e).

4) Minimum wages: Leprino failed to pay minimum wages to its employees in violation of Cal. Lab. Code §§ 510, 558, 1194, 1194.2, 1198 and Wage Order No. 8.

5) Wages for all work performed: Leprino failed to pay wages to its employees for all work performed in violation of Cal. Lab. Code § 204.

6) Overtime wages: Leprino failed to pay overtime wages to its employees in violation of Cal. Lab. Code §§ 510(a), 1194(a) and Wage Order No. 8.

7) Wages upon termination or resignation: Leprino failed to pay wages to its terminated or resigned employees in violation of Cal. Lab. Code §§ 201, 202, and 203.

/ / /

8) <u>Unfair business competition</u>: Leprino engaged in unfair business competition in violation of Cal. Bus. & Prof. Code §§ 17200 <u>et seq.</u> by engaging in the foregoing wage-and-hour violations.

# III.  Plaintiffs' Motion for Class Certification

Pursuant to Rule 23(b)(3), Plaintiffs move for certification of the following class:

> All non-exempt hourly workers who are currently employe[d], or formerly have been employed, as non-exempt hourly employees at Defendants' Lemoore West facilities in Lemoore, California, at any time within four years prior to the filing of the original complaint until resolution of this action.

Plaintiffs propose that they, Isaias Vasquez and Linda Hefke, be appointed as class representatives.  Plaintiffs propose that their counsel, Rex Parris and Philip Downey, be appointed as class counsel.

# IV.  Discussion

## 1.  Legal standard for Rule 23 class certification.

A class action is a procedural mechanism that allows for representative litigation.  This means that one or more class members may "litigate on behalf of many absent class members, and those class members are bound by the outcome of the representative's litigation."  <u>Newberg on Class Actions</u> § 1:1 (5th ed.) (citing <u>Supreme Tribe of Ben Hur v. Cauble</u>, 255 U.S. 356, 363 (1921)).  Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure, which imposes a two-step process in deciding whether a class may be certified.

The first step under Rule 23(a) asks whether the moving party demonstrated that the proposed class action satisfies each of the following four requirements:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)-(4).  If the proposed class action satisfies the forgoing four requirements of Rule 23(a), then the second step asks whether the proposed class action satisfies the requirements of Rule 23(b)(1),[2] Rule 23(b)(2), or Rule 23(b)(3).  Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

The movant bears the burden of affirmatively demonstrating to the district court through evidentiary proof that the proposed class action meets the requirements of Rule 23(a) and Rule 23(b).  Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013).  Federal courts throughout the country require the movant to demonstrate by a preponderance of the evidence that class certification is appropriate.  Newberg on Class Actions § 7:21 (5th ed.) (citing cases, including Martin v. Sysco Corporation, 325 F.R.D. 343, 354 (E.D. Cal. 2018) ("While Rule 23 does not specifically address the burden of proof to be applied, courts routinely employ the preponderance of the evidence standard.")).

In order to be "satisfied" that the class meets the prerequisites of Rule 23(a) and fits within one of the categories of Rule 23(b), the district court must conduct a "rigorous analysis."  General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 161 (1982).  The rigorous analysis may include "prob[ing] behind the pleadings," Comcast Corp., 569 U.S. at 33, and may also "entail overlap with the merits of the plaintiff's underlying claim," and this is because the analysis of Rules 23(a) and 23(b) "generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  Id. at 34.

 "[I]n evaluating a motion for class certification, a district court need only consider material sufficient to form a reasonable judgment on each Rule 23(a) requirement."  Sali v.

---

[2]  Through silence, Plaintiffs have indicated that Rule 23(b)(1) is inapplicable to this lawsuit and their certification motion.

Corona Reg'l Med. Ctr., 909 F.3d 996, 1005 (9th Cir. 2018) (emphasis added). This means that "a district court is not limited to considering only admissible evidence in evaluating whether Rule 23's requirements are met." Id. Nonetheless, "the district court need not dispense with the standards of admissibility entirely." Id. at 1006. Rather, the district court should analyze the "persuasiveness" of the evidentiary proof presented at the class certification stage and "may consider whether the plaintiff's proof is, or will likely lead to, admissible evidence." Id.

In evaluating expert testimony that supports class certification, the "district court should evaluate admissibility under the standard set forth in Daubert. But admissibility must not be dispositive. Instead, an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage." Id. (citations omitted). In other words, the court's evaluation of the evidence must focus on the persuasiveness of the evidence, for which admissibility is a factor but is not dispositive. See id.; Ellis v. Costco Wholesale Corp., 657 F.3d 970, 982 (9th Cir. 2011).

If a court decides to certify a class, the court must issue a certification order. Fed. R. Civ. P. 23(c)(1)(A)-(B). The certification order "must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g)." Id.

**2.      Rule 23(a) requirements.**

**A.      Ascertainable class.**

Rule 23 implicitly requires the proposed class to be ascertainable by reference to objective criteria, at least for class certification under Rule 23(b)(3). See Marcus v. BMW of North America, LLC, 687 F.3d 583, 592-93 (3d Cir. 2012); Jones v. ConAgra Foods, Inc., Case No. 12-cv-1633, 2014 WL 2702726, *8 (N.D. Cal. 2014); Lilly v. Jamba Juice Co., 308 F.R.D. 231, 236 (N.D. Cal. 2014); Newberg on Class Actions § 3:1 (5th ed.). While courts have "ascribe[d] widely varied meanings" to the term "ascertainability," Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1124 (9th Cir. 2017), there are three linguistic formulations commonly used to express the test for definiteness:

> [F]irst, that the class must be "precise, objective, and presently ascertainable"; second, that the class must be "adequately defined

and clearly ascertainable"; and third, that the class can be ascertained "by reference to" or "based on" "objective criteria."

Newberg on Class Actions § 3:3 (5th ed.) (citations omitted). The ascertainability requirement "protects absent plaintiffs in two ways — by enabling notice to be provided where necessary and by defining who is entitled to relief; and a definable class protects defendants by enabling a final judgment that clearly identifies who is bound by it." Id. at § 3:1. The movant for class certification bears the burden of sufficiently pleading a sufficiently ascertainable class. See Whitaker v. Bennett Law, PLLC, Case No. 13-cv-3145, 2016 WL 4595520, at *1 (S.D. Cal. 2016); Brazil v. Dell Inc., 585 F. Supp. 2d 1158, 1167 (N.D. Cal. 2008); Newberg on Class Actions § 3:3 (5th ed.). While the ascertainability requirement provides for an "objectively ascertainable" class, the Ninth Circuit does not require that the proposed class also be "administratively ascertainable." Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1123-26 (9th Cir. 2017). "Administrative feasibility means that identifying class members is a manageable process that does not require much, if any, individual factual inquiry." Newberg on Class Actions § 3:3 (5th ed.).

Leprino concedes that the proposed class is ascertainable, and the Court agrees, with one exception. The proposed class is defined as follows:

> All non-exempt hourly workers who are currently employe[d], or formerly have been employed, as non-exempt hourly employees at Defendants' Lemoore West facilities in Lemoore, California, at any time within four years prior to the filing of the original complaint until resolution of this action.

The contours of the class are largely ascertainable based on objective criteria, namely, whether someone was employed by Leprino as a non-exempt hourly employee at the Lemoore West facility. However, the proposed end date for the class period — "until resolution of this action" — is not ascertainable. An end date of "until resolution" or "until the present" creates "a moving target and presents potential case management problems." Taylor v. Autozone, Inc., Case No. 10-cv-8125, 2011 WL 2357652, at *1 (D. Ariz. June 14, 2011). By contrast, a "specified end date" promotes the "interests of clarity and finality" and "helps ensure that plaintiff-specific discovery will be completed in a timely manner." Id.; see also Decastro v. City of New York, No. 16-cv-3850, 2019 WL 4509027, at *7 (S.D.N.Y. Sept. 19, 2019) (redefining unascertainable class

period end date as the date the complaint was filed); <u>Hendricks v. Total Quality Logistics, LLC</u>, Case No. 10-cv-649, 2015 WL 13814202, at *4 (S.D. Ohio Mar. 30, 2015) (redefining unascertainable class period end date as the close of discovery date); <u>Hart v. Rick's NY Cabaret Int'l, Inc.</u>, Case No. 09-cv-3043, 2013 WL 11272536, at *5 (S.D.N.Y. Nov. 18, 2013) ("At the outset, the Court concludes that it is necessary to set a clear end-date to the class period.  The class as certified on December 20, 2010, by the judge then assigned to this case ran from 'six years prior to the filing of the Complaint to the entry of judgment in this case.'  But an open-ended end-date is untenable.  It fails to take account of the possibility that material facts might change.  And it denies the parties, after the close of fact discovery, a practical vehicle for exploring whether there have been material factual changes.  Lack of clarity as to the end date of the class period also has the potential to confuse putative class members as to whether their interests will, or will not, be represented in the pending lawsuit.") (citing cases in favor of ascertainable class period end date); <u>Hart v. Rick's Cabaret Int'l, Inc.</u>, 967 F. Supp. 2d 901, 910 (S.D.N.Y. 2013); <u>Jacks v. DirectSat USA, LLC</u>, Case No. 10-cv-1707, 2012 WL 2374444, at *8 (N.D. Ill. June 19, 2012) (redefining unascertainable class period end date as the date complaint was filed); <u>Taylor v. Autozone, Inc.</u>, Case No. 10-cv-8125, 2011 WL 2357652, at *1 (D. Ariz. June 14, 2011) (redefining unascertainable class period end date as the date of conditional class certification order); <u>Cruz v. Dollar Tree Stores, Inc.</u>, Case No. 07-cv-2050, 2009 WL 1974404, at *2 (N.D. Cal. July 2, 2009) (redefining unascertainable class period end date as the date of certification order).

To cure the lack of ascertainability with Plaintiffs' proposed class period end date, the end date of the class period will be redefined as the date of this certification order.  <u>See, e.g.</u>, <u>Ansoumana v. Gristede's Operating Corp.</u>, 201 F.R.D. 81, 85 n.2 (S.D.N.Y.2001) ("In my discretion, and in the interests of fairness and efficiency of case management, I fix the end date of the class period as the date of this decision."); <u>see also</u> <u>Taylor v. Autozone, Inc.</u>, Case No. 10-cv-8125, 2011 WL 2357652, at *1 (D. Ariz. June 14, 2011) (redefining unascertainable class period end date as date of conditional class certification order).

**B.      Numerosity and impracticability of joinder.**

Pursuant to Rule 23(a)(1), a class action is maintainable only if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Leprino concedes that the proposed class satisfies the numerosity requirement, and the Court agrees. The evidence before the Court does not conclusively establish the exact number of members in the proposed overarching class, but knowing the exact number of putative class members is not required. See Arnold Chapman and Paldo Sign & Display Co. v. Wagener Equities Inc., 747 F.3d 489, 492 (7th Cir. 2014). The proposed class is comprised of at least 1,000 individuals, which satisfies the numerosity requirement. See Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995) (stating that "numerosity is presumed at a level of 40 members") (citing Newberg on Class Actions § 3.05 (2d ed.)); Californians for Disability Rights, Inc. v. California Dep't of Transp., 249 F.R.D. 334, 347 (N.D. Cal. 2008) (stating that "precedent suggests that 20-40 class members is the 'grey area' for numerosity"). This is because it would be extremely difficult and inconvenient to join the hundreds or thousands of members in the proposed class, which means that joinder is impracticable.

**C.      Commonality.**

Pursuant to Rule 23(a)(2), a class action is maintainable only if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Under this requirement, the movant must show that there is "at least one common question of law or fact shared by the class, and . . . the common question not be peripheral but important to most of the individual class member's claims." Newberg on Class Actions § 3:18 (5th ed.). To say that the common question is shared by the class means that "the class members have suffered the same injury," not that the class members merely "suffered a violation of the same provision of law." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349-50 (2011). To say that the common question is not peripheral but important means that the determination of the common question "will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. at 350; see also Wang v. Chinese Daily News, Inc., 737 F.3d 538, 542 (9th Cir. 2013) (requiring the district court on remand to "determine whether the claims of the proposed class depend upon a common contention

1    . . . of such a nature that it is capable of classwide resolution") (citations omitted).

2        The commonality requirement has similarities with and serves as the foundation to the

3    commonality-predominance requirement of Rule 23(b)(3).  See Newberg on Class Actions § 3:27

4    (5th ed.) (explaining that Rule 23(b)(3)'s commonality-predominance requirement "obviously

5    builds on" Rule 23(a)(2)'s commonality requirement).  Because of the overlap between these two

6    requirements, the Court will analyze Rule 23(a)(2)'s commonality requirement below when the

7    Court analyzes Rule 23(b)(3)'s commonality-predominance requirement.

8        **D.    Typicality.**

9        Pursuant to Rule 23(a)(3), a class action is maintainable only if the "claims or defenses of

10   the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P.

11   23(a)(3).  "[T]ypicality determines whether a sufficient relationship exists between the injury to

12   the named plaintiff and the conduct affecting the class so that the court may properly attribute a

13   collective nature to the challenged conduct."  Newberg on Class Actions § 3:29 (5th ed.).

14   Accordingly, the typicality requirement "emphasizes that the representatives ought to be squarely

15   aligned in interests with the represented group."  Benjamin Kaplan, Continuing Work of the Civil

16   Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv. L. Rev. 356,

17   387 n.120 (1967).  The Ninth Circuit's test for typicality is (1) "whether other members have the

18   same or similar injury," (2) "whether the action is based on conduct which is not unique to the

19   named plaintiffs," and (3) "whether other class members have been injured by the same conduct."

20   Wolin v. Jaguar Land Rover North America, LLC, 617 F.3d 1168, 1175 (9th Cir. 2010) (citations

21   omitted).

22        Leprino concedes that the claims of the proposed class representatives, Isaias Vasquez

23   and Linda Hefke, are typical of the claims of the class, and the Court agrees.  First, the members

24   of the class have the same alleged injury as Vasquez and Hefke.  For example, like Vasquez and

25   Hefke, other members of the class are allegedly did not receive compliant meal and rest breaks.

26   Second, the claims of Vasquez and Hefke are not based on conduct that is unique to them but are,

27   instead, based on Leprino's conduct rendered towards the entire class.  Third, the members of the

28

class and Vasquez and Hefke have allegedly been injured by the same conduct, such as Leprino's failure to provide employees with compliant meal and rest breaks.

**E.** **Adequacy of representation.**

Pursuant to Rule 23(a)(4), a class action is maintainable only if the "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The term "parties" refers to both the class representative and the class counsel. See Beck v. Maximus, Inc., 457 F.3d 291, 296 (3d Cir. 2006); In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Marketing Litigation, 270 F.R.D. 521, 531 (N.D. Cal. 2010). Therefore, "the standard for adequacy splits into two prongs: adequacy of the proposed class representative and adequacy of the attorneys seeking appointment as class counsel." Newberg on Class Actions § 3:54 (5th ed.).

*(i)* *Adequacy of class representative.*

The adequacy of the class representative focuses on both "whether there are conflicts of interest between the proposed representative and the class, and whether the proposed representative is qualified to serve as a class representative . . . ." Id.

Vasquez and Hefke are adequate class representatives. First, they are not conflicted. Their primary interests are, first, proving that Leprino's policies — and not the team managers — violated California's wage-and-hour laws and; and, second, recovering restitution and penalties from Leprino — not from the team managers. Despite Leprino's contention to the contrary, Plaintiffs' primary interests do not conflict with the interests of the team managers, who are putative members of the class. Simply because the team managers implemented Leprino's allegedly unlawful policies does not mean, as Leprino contends, that Plaintiffs "have assigned partial responsibility for wage and hour violations to [the team managers]." Doc. No. 120 at 59. There is no indication that Plaintiffs are placing legal blame on the team managers' shoulders. Cf. Hughes v. WinCo Foods, No. ED CV11-00644 JAK, 2012 WL 34483, at *7 (C.D. Cal. Jan. 4, 2012) (finding an adequacy conflict where the class representatives "assign[ed] partial responsibility for labor law violations" to members of the proposed class). This is not surprising because there is no indication that the team managers were responsible for creating Leprino's facility-wide policies. Plaintiffs are advancing claims that attack Leprino's facility-wide policies,

and those policies allegedly violated the team managers' employment rights in the same way that they affected the rights of Plaintiffs and the rest of the class. Thus, it is not evident to the Court that Plaintiffs are conflicted with the team managers. See Pena v. Taylor Farms Pac., Inc., 305 F.R.D. 197, 215 (E.D. Cal. 2015) (finding no adequacy-conflict where the employer's policies universally affected all members of the class, including supervisors who implemented the policies but were also putative members of the class). See also J.D. v. Azar, 925 F.3d 1291, 1317 (D.C. Cir. 2019) ("[C]ourts have been reluctant to find the class representatives inadequate even if some class members have an explicit desire to maintain the status quo.") (citations omitted); Ruggles v. WellPoint, Inc., 272 F.R.D. 320, 338 (N.D.N.Y. 2011) (holding that representatives were adequate in wage-and-hour lawsuit although some of the employee class members did not share the goals of the litigation, particularly because "[a]dequacy is not undermined where the opposed class members' position requires continuation of an allegedly unlawful practice.").

Second, Plaintiffs are sufficiently qualified to serve as class representatives, as demonstrated by multiple points. Plaintiffs understand the essence of this lawsuit — that it deals with employment claims involving rest breaks, working off-the-clock, and de-crewing. They sat for their depositions (twice for Hefke). They responded to Leprino's written document requests, and Vasquez responded to Leprino's written requests for admission. They communicate and work with their counsel. They intend, even with this lawsuit approaching its three-year mark, to continue in their representative capacities until there is a resolution. And while it may be true, as Leprino asserts, that they rely heavily on their attorneys and do not clearly understand every development in this lawsuit — such as the filing of motions, the amendment of pleadings, and their counsel's legal strategy — this does not mean that they are unqualified. Newberg on Class Actions § 3:67 (5th ed.) ("[C]ourts have similarly held that while a plaintiff must have some knowledge of the litigation and facts of the case, a class representative need only possess a minimal degree of knowledge necessary to meet the adequacy standard.") (quoting New Directions Treatment Services v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007) and citing other federal circuit cases).

19

### (ii)    *Adequacy of class counsel.*

The adequacy of class counsel focuses on "whether the attorneys who seek to represent the class are competent to do the job." Newberg on Class Actions § 3:54 (5th ed.). To determine the adequacy of the class counsel, Rule 23(g) requires the court to consider the following four factors: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Here the proposed class counsel includes Rex Parris and Philip Downey, both of whom declare that they have experience litigating employment-related claims and several class action lawsuits. Leprino does not challenge the adequacy of the proposed class counsel, and the Court concludes that the proposed class counsel are adequate. Having considered Rule 23(g)'s factors, the Court finds that class counsel (1) sufficiently identified and investigated potential claims in this lawsuit; (2) have sufficient experience litigating class actions and wage-and-hour-related claims; (3) appear to have sufficient knowledge of the applicable wage-and-hour laws; and (4) appear to be willing and able to commit sufficient resources to representing the proposed class.

### 3.    Rule 23(b)(3) requirements.

A class action may be maintained under Rule 23(b)(3) if the proposed class satisfies the requirements of Rule 23(a) and the following two requirements of Rule 23(b)(3): first, common questions predominate over any questions affecting only individual members; and, second, class resolution is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3); Amchem Products, Inc. v. Windsor, 521 U.S. 591, 615 (1997).

### A.    Commonality-predominance.

The commonality and predominance requirement of Rule 23(b)(3) asks whether the class members' interests are "sufficiently cohesive to warrant adjudication by representation." Id. at 623. The inquiry "logically entails two steps": first, whether the issues in the case are individual

or common; and, second, whether the common issues predominate over the individual issues. Newberg on Class Actions § 4:50 (5th ed.).

As for the first step, an individual issue is one where "the members of a proposed class will need to present evidence that varies from member to member." Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. __, 136 S. Ct. 1036, 1045 (2016) (citing Newberg on Class Actions § 4:50 (5th ed.)). By contrast, a common issue is one either where "the same evidence will suffice for each member to make a prima facie showing," Tyson Foods, Inc., 136 S. Ct. at 1045 (citing Newberg on Class Actions § 4:50 (5th ed.)), or, similarly, where the issue is "susceptible to generalized, class-wide proof." In re Nassau County Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006).

As for the second step, common issues likely will not predominate if "a great deal of individualized proof" would need to be introduced to address most or all of the elements of a claim, Klay v. Humana, Inc., 382 F.3d 1241, 1255 (11th Cir. 2004), or "a number of individualized legal points" would need to be established after common questions were resolved, id., or "the resolution of . . . [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues." Cooper v. Southern Co., 390 F.3d 695, 722 (11th Cir. 2004). By contrast, common questions likely will predominate if "individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria — thus rendering unnecessary an evidentiary hearing on each claim," Smilow v. Southwestern Bell Mobile Systems, Inc., 323 F.3d 32, 40 (1st Cir. 2003) (citing Roper v. Consurve, Inc., 578 F.2d 1106, 1112 (5th Cir. 1978)), or "when adding more plaintiffs to the class would minimally or not at all affect the amount of evidence to be introduced." Newberg on Class Actions § 4:50 (5th ed.) (citing Klay v. Humana, Inc., 382 F.3d 1241, 1255 (11th Cir. 2004)).

A finding of predominance will generally not be "defeat[ed]" merely because there is a need to make individualized damage determinations. See Just Film, Inc. v. Buono, 847 F.3d 1108, 1121 (9th Cir. 2017); Leyva v. Medline Indus. Inc., 716 F.3d 510, 514 (9th Cir. 2013); see also Comcast Corp. v. Behrend, 569 U.S. 27, 35 (2013) (Ginsburg and Breyer, JJ., joined by Sotomayor and Kagan, JJ., dissenting) (stating in case resolved on other grounds that "[r]ecognition that individual damages calculations do not preclude class certification under Rule

21

1  23(b)(3) is well nigh universal" and that ordinarily "individual damages calculations should not

2  scuttle class certification under Rule 23(b)(3)").

3     Here the Court will undertake the commonality and predominance inquiry by analyzing

4  each of Plaintiffs' claims seriatim, and this is because "[c]onsidering whether questions of law or

5  fact common to class members predominate begins, of course, with the elements of the underlying

6  cause of action." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011).

7                    *(i)* **On-call meal and rest breaks.**[3]

8     California Labor Code § 226.7(b) states that an "employer shall not require an employee to

9  work during a meal or rest or recovery period mandated pursuant to an applicable statute, or

10  applicable regulation, standard, or order of the Industrial Welfare Commission, the Occupational

11  Safety and Health Standards Board, or the Division of Occupational Safety and Health."

12     Wage Order No. 8 governs meal and rest breaks for employees in industries handling

13  products after harvest. As for meal breaks, Wage Order No. 8 states, "No employer shall employ

14  any person for a work period of more than five (5) hours without a meal period of not less than 30

15  minutes, except that when a work period of not more than six (6) hours will complete the day's

16  work the meal period may be waived by mutual consent of the employer and the employee." 8

17  Cal. Code Regs. § 11080(11)(A). Wage Order No. 8 continues,

18                Unless the employee is relieved of all duty during a 30 minute meal
                period, the meal period shall be considered an "on duty" meal
19                period and counted as time worked. An "on duty" meal period shall
                be permitted only when the nature of the work prevents an
20                employee from being relieved of all duty and when by written
                agreement between the parties an on-the-job paid meal period is
21                agreed to. The written agreement shall state that the employee may,
                in writing, revoke the agreement at any time.
22

23  Id. at § 11080(11)(C). Wage Order No. 8 continues, "If an employer fails to provide an employee

24  a meal period in accordance with the applicable provisions of this order, the employer shall pay

25  ─────────────────────

26  [3] In connection with arguing that Plaintiffs' meal and rest break claim lacks a common question that predominates,
   Leprino requests the Court to take judicial notice of the following California government materials: (1) State of
   California, Department of Industrial Relations, Division of Labor Standards Enforcement, Labor Commissioner's

27  Office Opinion Letter, dated Jan. 28, 1992; and (2) State of California, Department of Industrial Relations, Division of
   Labor Standards Enforcement, Labor Commissioner's Office Website, webpage information concerning reporting

28  time pay. Doc. No. 121. The Court takes judicial notice of the letter, see Fed. R. Evid. 201(b)(2), but not the
   webpage because, based on Leprino's provided URL, the webpage appears to be no longer operational.

the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided." Id. at § 11080(11)(D).

Generally, the employer's duty to provide a meal break is discharged "if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so." Brinker Rest. Corp. v. Superior Court, 53 Cal. 4th 1004, 1040 (2012). If the employer fails to provide the employee with the meal break, then the employer "shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal . . . period is not provided." Cal. Lab. Code § 226.7(c).

As for rest breaks, Wage Order No. 8 states,

> Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 ½) hours. Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages.

> If an employer fails to provide an employee a rest period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the rest period is not provided.

Id. at § 11080(12)(A)-(B).

If the employer forces the employee to miss a required rest break or does not provide the employee with a required rest break, then the employee is entitled to be paid immediately for the missed rest break. Murphy v. Kenneth Cole Prods., Inc., 40 Cal. 4th 1094, 1108 (2007); see also Brinker Rest. Corp. v. San Diego Cty. Superior Court, 53 Cal. 4th 1004, 1033 (2012) (stating that an employee is incapable of waiving a rest break if the employer never authorized the rest break). Specifically, the employer "shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the . . . rest recovery period is not provided." Cal. Lab. Code § 226.7(c).

Plaintiffs' meal and rest break claim is based on what could be called a "control" or "on call" theory, which is a theory articulated by the California Supreme Court in <u>Brinker</u> and <u>Augustus</u>. In <u>Brinker Rest. Corp. v. Superior Court</u>, 53 Cal. 4th 1004 (2012), the California Supreme Court stated that the "fundamental employer obligations associated with a meal break" are "to relieve the employee of all duty and relinquish any employer control over the employee and how he or she spends the time." <u>Id.</u> at 1038-39. In <u>Augustus v. ABM Sec. Servs., Inc.</u>, 2 Cal. 5th 257 (2016), the California Supreme Court stated that "employees must not only be relieved of work duties [during rest breaks], but also be freed from employer control over how they spend their time." Id. at 270. Accordingly, the California Supreme Court explained in <u>Augustus</u> that if an employee is effectively on call or under the employer's control during a meal or rest break because, for example, the employee must be available to respond to employer's requests during the break, then the provided break is not control-free and, consequently, not legally compliant. <u>Id.</u>

Based on <u>Brinker</u> and <u>Augustus</u>, Plaintiffs' theory for the meal and rest break claim is that although Leprino's written meal and rest break policies are facially compliant, and although Leprino schedules facially compliant meal and rest breaks for its employees, Leprino nonetheless "requires the production workers at the Lemoore West plant to remain on-call during their breaks," which is a violation of Wage Order No. 8 and Labor Code § 226.7. Doc. No. 116-1 at 26. Leprino claims that the following facts collectively demonstrate that Leprino's employees are on call during their breaks: (1) Leprino's policies stress quality and quotas and pressure employees to avoid production delays, even if that means working during breaks, for example, on machinery; (2) Leprino's policies stress "over communication," as illustrated, in part, by the radios, intercoms, and work phones in breakrooms; (3) Leprino's written policies stress responsiveness and obedience to superiors' requests and instructions, as illustrated in the employee handbook; (4) Leprino's unwritten policies and practices require and pressure employees to carry their radios at all times and respond at all times to calls made on the intercom, breakroom phone, and in person, even if those calls are made during breaks; and (5) Leprino does not tell its employees that they need not respond to work-related matters during breaks. Collectively, these facility-wide policies and practices, according to Plaintiffs, demonstrate that the employees are effectively on call at all

times, even during their breaks — which in turn means Leprino fails to provide legally compliant breaks.

Plaintiffs contend that this "on call" theory of liability naturally provides a common question that is central to the meal and rest break claim. Namely, in light of Leprino's foregoing facility-wide policies and practices, are the class members actually "on call" during breaks? Or, in other words, are the class members not truly freed from Leprino's control during their breaks? According to Plaintiffs, if the answer is yes, then Leprino is liable for violating the class's meal and rest break rights; and if the answer is no, then Leprino is not liable.

The Court agrees that the foregoing question satisfies the commonality requirement of Rule 23(a). Plaintiffs, through several witness declarations and depositions from hourly employees who are putative members of the class, presented sufficient proof showing that the class was subjected to Leprino's foregoing policies and practices. Thomasson v. GC Servs. Ltd. P'ship, 539 F. App'x 809, 810 (9th Cir. 2013) (citing Evon v. Law Offices of Sidney Mickell, 688 F.3d 1015, 1029 (9th Cir. 2012)) ("To satisfy commonality, there must be significant proof that the entire class suffered a common injury."); Staton v. Boeing Co., 327 F.3d 938, 954 (9th Cir. 2003) ("The breadth and consistency of class counsel's initial evidence places the district court's finding of commonality well within that court's discretion."). For example, as documented above, see supra § II, many putative class members stated that they and other employees were regularly contacted during their breaks about work-related matters, be it via radio, intercom, breakroom phone, or in person. And there is no dispute that the entire class was subjected to Leprino's official policies stressing quality, "over communication," and responsiveness and obedience to superiors' requests and instructions. Moreover, the question of whether Leprino's policies and practices put the class members on call during their breaks is capable of class-wide resolution, and this is because the "determination of [the question's] truth or falsity will resolve an issue that is central to the validity of each" member's meal and rest break claim "in one stroke." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).

Leprino contends that commonality is absent for a number of reasons. First, the only universal policies from Leprino are the official written policies, such as those in the employee

handbooks.  By contrast, the alleged "policies" about employees being required to keep radios on and responding to interruptions during breaks, for example, are not common to the entire class. These alleged policies are, according to Leprino, anecdotal and merely a reflection of the experiences of a "small subset of employees."  Doc. No. 120 at 34.  The Court disagrees.  As previously stated, Plaintiffs provided sufficient proof from putative members of the class showing for class certification purposes that the alleged policies — including the radio and breakroom policies — affected most, if not all, of the class members.  See supra § II.  And again, as for the official policies stressing quality, "over communication," and responsiveness and obedience to superiors' requests and instructions, there is no dispute that the entire class was subjected to these policies.

Also unavailing is Leprino's contention that commonality is absent because Lemoore West is comprised of several different departments, each with differing duties.  Although this contention is plausible, it is unavailing for the simple reason that Leprino failed to persuasively show, for example, that the alleged policies and practices affected only some of the departments.

Also unavailing is Leprino's contention that "the weight of the evidence presented" demonstrates that Plaintiffs' witnesses are either lying or statistical outliers.  To support this contention, Leprino relies primarily on witness declarations from fifty-six Leprino employees, virtually all of whom uniformly declared that they and other employees at Leprino were completely freed from employer control during breaks.  These declarations, however, do not outweigh or refute the many witness declarations presented by Plaintiffs (cited to supra § II), and this is for a fairly simple reason: of Leprino's fifty-six declarations, no more than five are from employees who are putative members of the class (i.e., (1) Angela Azpiroz, (2) Megan Bowen, (3) Lydia Castro, (4) Terrance Madden, and (5) Casey McMahan).  The other fifty-one declarations come from salaried employees, all but one of whom (Alejandro Osuna) are either managers or supervisors.  With respect to Plaintiffs' on-call theory, the Court finds the testimony from most[4] of

---

[4] Leprino attacks the credibility of several of Plaintiffs' witnesses' testimony.  The Court analyzed those attacks and, where persuaded, disregarded certain testimony from some of Plaintiffs' witnesses.  For example, the Court disregarded certain testimony from (1) Fili Monzon about being held responsible for work matters that occurred while on breaks; (2) Armindo Calouro about being required to answer radio calls during breaks; (3) Courtney Mateos and Fili Monzon about observing other workers responding to work-related calls during breaks; (4) Jeremy Henderson

Plaintiffs' witnesses' declarations more persuasive than the uniform testimony from Leprino's salaried managers and supervisors, none of whom are putative members of the class.

Also unavailing is Leprino's argument that Plaintiffs' witnesses' testimony is "unspecific." As for the relevant testimony from Plaintiffs' witnesses, the Court found it sufficiently specific, as documented above. See <u>supra</u> § II.

Also unavailing is Leprino's argument that Plaintiffs' alleged radio policies and practices are not facility-wide because only a fraction of the employees at Lemoore West carry radios. While that may be true, the radio policies and practices are but one alleged component of Plaintiffs' broader on-call theory. Further, the radio policies and practices, even though not directly applicable to non-carrying employees, may be reasonably considered by the factfinder as reflective or symbiotic of a facility-wide policy that prioritizes work above breaks. This consideration would be especially warranted if most or all of the radio-carrying employees were of the understanding that they were required to keep their radios on at all times, as several of Plaintiffs' witnesses testified.

Also unavailing is Leprino's argument that Plaintiffs' alleged policies and practices do not relate to breaks. Obviously that argument is erroneous with respect to the radio policies and the regular practice of interruptions during breaks, such as via intercoms, breakroom phones, and in-person visits. Moreover, as for the policies about quotas, avoiding production delays, and responsiveness to superiors' requests and instructions, these policies are relevant to breaks because they can naturally and foreseeably encroach into break policies and practices. This is illustrated by the fact that Leprino (prior to Plaintiffs filing this lawsuit) did not have an official written policy that clearly stated that employees need not respond to work-related matters during their breaks — but then Leprino added to its break-time policies in 2019 by implementing a new radio policy; namely, that radio calls need not be responded to during meal breaks. The point is that Plaintiffs' alleged policies and practices do and reasonably can relate to breaks.

---

about being told he was responsible for his machine during breaks; and (5) Sergio de la Torre about being de-crewed less than four hours into his shifts.

Having concluded that Plaintiffs' meal and rest break theory satisfies the commonality requirement of Rule 23(a), the Court turns to the predominance requirement of Rule 23(b)(3). As previously stated, a central common question for Plaintiffs' meal and rest break claim is whether Leprino's class-wide policies and practices effectively resulted in employees being placed on call during breaks. Because answering this common question does not require a "great deal of individualized proof," Klay v. Humana, Inc., 382 F.3d 1241, 1255 (11th Cir. 2004), but instead can be answered with the aforementioned facility-wide policies and practices, the Court concludes that the common question predominates over any individualized inquires, thereby satisfying Rule 23(b)(3).

According to Leprino, individualized questions predominate for multiple reasons. First, important questions — such as whether employees were regularly interrupted during breaks and whether employees were expected to respond to work-related matters during breaks — are individualized questions because the answers will vary based on the employees' varying job positions, shift, assignments, departments, and subgroups. This argument is unavailing because the Court already found that Plaintiffs' alleged policies and practices are sufficiently facility-wide. Again, based on the evidence presented from the parties at this certification phase — including the fifty-six declarations from Leprino's witnesses — the Court is not persuaded that Leprino's policies and practices varied significantly amongst most putative class members.

Leprino also argues that "in instances where a putative class member experienced interruptions to his or her rest breaks, the Court will need to determine whether the interruptions were work-related, whether the employee voluntarily skipped their rest breaks and/or whether the employee was provided another rest break to compensate for the interruption." Doc. No. 120 at 44-45. Leprino is incorrect, and that is because Leprino mishandles Plaintiffs' theory. Plaintiffs' theory is not focused on the reason for each interruption to each employee's many breaks. Rather, the focus is on facility-wide policies and practices: namely, did those policies and practices effectively place all putative class members on call during all breaks? If the factfinder says yes, then Leprino is liable across the board. This point undercuts Leprino's additional argument that Plaintiffs have not and cannot establish a method for determining class-wide damages. Because

28

Plaintiffs' theory seeks liability across-the-board, determining class-wide damages can be easily calculated with "computer records, clerical assistance, and objective criteria," such as class-wide timesheets, "thus rendering unnecessary an evidentiary hearing on each claim." Smilow v. Southwestern Bell Mobile Systems, Inc., 323 F.3d 32, 40 (1st Cir. 2003). Also undercutting Leprino's argument is the rule that holds that a "finding of predominance will generally not be "defeat[ed]" merely because there is a need to make individualized damage determinations. See Just Film, Inc. v. Buono, 847 F.3d 1108, 1121 (9th Cir. 2017).

In sum, the Court concludes that Plaintiffs' meal and rest break claim satisfies the commonality and predominance requirements of Rule 23(a) and Rule 23(b)(3). Accordingly, Plaintiffs' meal and rest break claim (insofar as it is premised on the on-call break theory) will be certified under Rule 23(b)(3).

### (ii)     *Off-the-clock claim and derivative claims.*

"A plaintiff may establish liability for an off-the-clock claim by proving that (1) he performed work for which he did not receive compensation; (2) that defendants knew or should have known that plaintiff did so; but that (3) the defendants stood idly by." Jimenez v. Allstate Ins. Co., 765 F.3d 1161, 1165 (9th Cir. 2014) (citation omitted).

Plaintiffs' theory for the off-the-clock claim is that employees worked off the clock during their meal breaks, which were on call, and after their shifts when they fielded work-related phone calls. Insofar as the off-the-clock claim is premised on the after-work phone calls, the Court concludes that individualized questions predominate. This is because to prove liability on this theory, Plaintiffs would have to offer evidence as to each answered after-work work-related phone call. Neither party appears to have computerized records or objective criteria that captures this evidence, which in turn means the evidence would need to be offered on a employee-by-employee basis. That is the type of extensive individualized inquiry that Rule 23(b)(3) does not welcome.

Insofar as the off-the-clock claim is premised on the on-call meal break theory — i.e., the theory that the class members were working off the clock during their on-call meal breaks — the Court concludes that the commonality and predominance requirements of Rule 23(a) and Rule 23(b)(3) are satisfied. Under this theory, a common question is whether Leprino's policies and

practices effectively placed the class members on call during meal breaks. And as previously discussed with respect to the meal and rest break claim, this common question predominates. If the answer to the question is yes, then determining liability and calculating damages entails assessing the number of the class members' on-call breaks; and if the answer is no, then determining liability is a moot point.

As for the derivative claims, Plaintiffs assert that their claims for overtime, minimum wage, failure to compensate for all hours worked, accurate itemized wage statements, failure to pay wages when due, and unfair competition are premised on the off-the-clock claim. These claims satisfy the commonality and predominance requirements of Rule 23(a) and Rule 23(b)(3) under the same reasoning that the meal and rest break claim do. As with the meal and rest break claim, to establish liability for these derivative claims, a common question is whether Leprino's policies and practices effectively put the class members on call during breaks — and as previously discussed, this common question predominates.

Consequently, Plaintiffs' off-the-clock claim (insofar as it is premised on the on-call break theory) and aforementioned derivative claims will be certified under Rule 23(b)(3).

### *(iii)* *Reporting time claim.*

Wage Order No. 8 states, "Each workday an employee is required to report for work and does report, but is not put to work or is furnished less than half said employee's usual or scheduled day's work, the employee shall be paid for half the usual or scheduled day's work, but in no event for less than two (2) hours nor more than four (4) hours, at the employee's regular rate of pay, which shall not be less than the minimum wage."

According to Plaintiffs' theory for the reporting time claim, Leprino's de-crewing policy is as follows: Leprino schedule too many employees for a shift; then Leprino gives the employees who show the option of voluntarily going home without working; then, if there are not enough volunteers to go home, Leprino involuntarily tells the requisite number of employs to go home without working; and if those workers want to receive pay for the shift, then they must use a vacation day by filling out a time-off request form.

The Court concludes that there is no common question sufficient to satisfy Rule 23(a). This is because Plaintiffs failed to show that "the class members have suffered the same injury" with respect to de-crewing. <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 349-50 (2011). Unlike with the meal and rest break claim, only a handful of Plaintiffs' witnesses provided persuasive testimony supporting Plaintiffs' theory, and even then the testimony from those witnesses was not in harmony — there were inconsistencies amongst the witnesses' testimony. Moreover, it is telling that several of Plaintiffs' witnesses who testified in support of the meal and rest break claim did not and, presumably, could not offer similar support for the de-crewing claim — thus further demonstrating that the entire class did not suffer a common injury with respect to Plaintiffs' proposed de-crewing theory. As Leprino currently contends, these evidence shows, at most, that "there were rare, individualized deviations from Leprino's uniform, legally compliant de-crewing policy." Doc. No. 120 at 55.

Consequently, Plaintiffs' de-crewing claim will not be certified.

# **<u>ORDER</u>**

Accordingly, IT IS HEREBY ORDERED as follows:

1. Plaintiffs' certification motion (Doc. No. 116) is GRANTED, IN PART, and DENIED, IN PART, as follows:

   a. Plaintiffs' following claims, as discussed above, are CERTIFIED for class aggregation under Rule 23(b)(3): meal and rest break; off-the-clock; overtime; minimum wage; failure to compensate for all hours worked; accurate itemized wage statements; failure to pay wages when due; and unfair competition.

   b. The class is defined as follows:

      > All non-exempt hourly workers who are currently
      > employed, or formerly have been employed, as non-
      > exempt hourly employees at Leprino's Lemoore
      > West facilities in Lemoore, California, at any time
      > within four years prior to the filing of the original
      > complaint until March 31, 2020.

   c. Isaias Vasquez and Linda Hefke are APPOINTED as the class representatives.

d.   Rex Parris and Philip Downey are APPOINTED as the class counsel.

e.   Plaintiffs' other claims are NOT CERTIFIED for class aggregation under Rule 23.

2.   The parties must promptly MEET AND CONFER about the submission of a joint stipulated class notice and distribution plan.  Within twenty-one days of this order, the parties must FILE either a stipulated class notice and distribution plan or a notice that no stipulation can be agreed to.  If the parties cannot agree to a class notice or distribution plan, then Plaintiffs must FILE a proposed class notice and distribution plan within thirty-five days of this order, and Leprino shall have fourteen days following Plaintiffs' filing to file any objections, and Plaintiffs shall have seven days following Leprino's filing to FILE a reply.

3.   This case is REFERRED BACK to the assigned magistrate judge for further scheduling and other proceedings consistent with this order.

IT IS SO ORDERED.

Dated:   March 30, 2020

_____
SENIOR  DISTRICT  JUDGE