1

2

3

4

UNITED STATES DISTRICT COURT

5

FOR THE EASTERN DISTRICT OF CALIFORNIA

6

7

8
ISAIAS VASQUEZ and LINDA HEFKE
on behalf of all other similarly situated
individuals,

9

Plaintiffs,

10

vs.

11

12
LEPRINO FOODS COMPANY, a
Colorado Corporation; LEPRINO

13
FOODS DAIRY PRODUCTS
COMPANY, a Colorado Corporation; and

14
DOES 1-50, inclusive,

15
Defendants.

16

17

18

Case No. 1:17-cv-00796-JLT-BAM

Member cases:

1:13-cv-02059-JLT-BAM
1:15-cv-00105-JLT-BAM
1:17-cv-00686-JLT-BAM
1:18-cv-01404-JLT-BAM
2:20-cv-00700-JLT-BAM

**ORDER OVERRULING OBJECTIONS
TO FINAL APPROVAL OF CLASS
ACTION SETTLEMENT AND DENYING
REQUEST FOR INTERVENTION** (Doc.
468)

**ORDER GRANTING FINAL APPROVAL
OF SETTLEMENT** (Doc. 462)

19      Currently pending before the Court is the motion for final approval of class action

20 settlement filed by Plaintiffs Isaias Vasquez,[1] Linda Hefke, Jerrod Finder, Jonathan Talavera,

21 John Perez, Andrew Howell, and Fred Walter (collectively "Plaintiffs") on behalf of themselves

22 and others similarly situated filed on April 18, 2024.  (Doc. 462.)  Defendants Leprino Foods

23 Company and Leprino Foods Dairy Products Company (collectively "Defendants" or "Leprino,")

24 filed a statement of non-opposition on May 2, 2024. (Doc. 463.)  On May 14, 2024, Steven

25 Bowles ("Bowles"), through counsel, filed an objection to final approval of the settlement and an

26 alternate request for intervention.[2]  (Doc. 468.)

27

28
[1] Plaintiff Vasquez is also referred to as "Vazquez."
[2] On May 7, 2024, attorney Morris Nazarian filed a motion or petition for leave to intervene to enforce a

1

The motion for final approval was referred to the undersigned following consent by the parties for the motion to be heard and decided by the magistrate judge.  (Docs. 450, 451.)  The motion came before the Court for hearing on June 14, 2024.  Counsel Ryan Crist appeared by Zoom video on behalf of Plaintiffs.  Counsel Lisa Pooley appeared by Zoom video on behalf of Leprino.  Counsel Morris Nazarian also appeared by Zoom video.  Additionally, attorney Kacey Cook appeared by Zoom video on behalf of objector Bowles.

Having considered the briefing, the arguments of counsel, and the record in this case, the request for final approval of the Settlement will be granted. Bowles' objections will be overruled and his request to opt-out, for exclusion, or alternatively, to intervene will be denied. Additionally, the request for attorneys' fees will be granted in the amount of $1,400,000.00; litigation costs will be awarded in the amount of $800,000.00; settlement administration costs will be granted in the amount of $25,375.94; and enhancement awards will be granted to the class representatives in the total amount of $45,000.00.

## **BACKGROUND**

### A.  Background of the Leprino Cases

Beginning in 2013 and until 2020, Plaintiffs filed a series of proposed class actions against Leprino challenging various of Leprino's employment policies and practices.  After years of litigation, Plaintiffs now seek final settlement approval of the following cases pending in this Court: (1) *Finder v. Leprino Foods Company, et al.*; (2) *Talavera v. Leprino Foods Company, et al.*; (3) *Vasquez, et al. v. Leprino Foods Company, et al.*; (4) *Perez v. Leprino Foods Company, et al.*; (5) *Howell v. Leprino Foods Company, et al.*; and (6) *Walter v. Leprino Foods Company, et al.* (collectively "Leprino Cases").[3]  The Leprino Cases challenge certain wage and hour policies and practices, which allegedly resulted in denial of full compensation for employees, at some or all of Leprino's three processing facilities in California:  Lemoore West, Lemoore East, and

---

charging lien for fees and expenses, which was amended twice, but then subsequently withdrawn.  (*See* Docs. 464, 465, 467, 471.)  At the hearing, Mr. Nazarian confirmed withdrawal of the motion.

[3] Plaintiffs previously requested preliminary approval of the settlement to resolve *Null v. Leprino Foods Company, et al.*, Case No. 1:19-cv-00525-AWI-BAM.  Because that case was remanded to Kings County Superior Court on January 22, 2020, the Court lacked jurisdiction to resolve any issue related to *Null*, including any request for an enhancement award.

2

Tracy.  All of the Leprino Cases were ultimately related to one another under this Court's Local Rule 123.

The Leprino Cases were consolidated on December 7, 2023, for purposes of preliminary and final approval of the settlement.  (Doc. 454.)  The Leprino Cases are described as follows:

### *Finder* and *Talavera* Cases

Plaintiff Jerrod Finder filed a lawsuit entitled *Finder v. Leprino Foods Company, et al*., Case No. 1:13-cv-02059-JLT-BAM ("*Finder*"), on November 15, 2013, alleging California Labor Code violations including failures to provide a second meal break or accurate itemized wage statements, waiting time violations, Unfair Business Practices Act violations, and Private Attorneys General Act ("PAGA") claims based on those substantive violations.  On January 21, 2015, Plaintiff Jonathan Talavera filed a second wage-and hour class action against Leprino entitled *Talavera v. Leprino Foods Company*, et al., Case. No. 1:15-cv-00105-JLT-BAM ("*Talavera*").  On November 21, 2016, the Honorable Anthony W. Ishii, the then-assigned district judge, found significant overlap between *Finder* and *Talavera* and consolidated them into a single action (*Finder*, 1:13-v-02059, Doc. 63).  Much of the litigation in *Finder* and *Talavera* was stayed pending an interlocutory appeal and then while awaiting the *Vasquez* case, described below, to be resolved.  (*Finder,* 1:13-cv-02059, *see*, *e.g.,* Docs. 49, 81, 134, 146.)

### *Perez* Case

On April 13, 2017, Plaintiff John Perez filed a similar wage-and-hour class action on behalf of the hourly employees at Leprino's Lemoore East facility, which Leprino removed to federal court, entitled *Perez v. Leprino Foods Company, et al*., Case No. 1:17-cv-00686-JLT-BAM ("*Perez*").  *Perez* challenged policies and practices of requiring non-exempt employees to work substantial amounts of time without pay as a result of donning and doffing of sanitary gear off the clock, and allegedly failing to provide their non-exempt employees with the meal and rest periods.  The Court related *Perez* to *Finder/Talavera*.  On January 6, 2021, Judge Ishii granted class certification of certain of *Perez's* off-the-clock, meal and rest period, and derivative claims.  (*Perez*, 1:17-cv-00686, Doc.74.)

1        ***Vasquez* Case**

2        On May 8, 2017, Plaintiffs Isaias Vasquez and Linda Hefke filed another wage-and-hour

3 class action on behalf of the hourly employees at Leprino's Lemoore West facility, which Leprino

4 removed to federal court, entitled *Vasquez, et al. v .Leprino Foods Company, et al*., Case No.

5 1:17-cv-00796-JLT-BAM ("*Vasquez*"), The Court related *Vasquez* to *Perez* and *Finder/Talavera*.

6 On March 31, 2020, Judge Ishii granted class certification of claims for meal and rest break; off-

7 the-clock; overtime; minimum wage; failure to compensate for all hours worked; accurate

8 itemized wage statements; failure to pay wages when due; and unfair competition claims.

9 (*Vasquez*, 1:17-cv-796, Doc. 163 at 31.) [4] Thereafter, Plaintiffs and Defendants proceeded to a

10 jury trial on March 14, 2023.  The jury returned a verdict in Leprino's favor and against Plaintiffs

11 on April 6, 2023. (*Vasquez*, 1:17-cv-796, Doc. 430.)   Following the jury's verdict, Plaintiffs

12 appealed.  During the pendency of the appeal, the parties settled the Leprino Cases.

13        ***Howell* Case**

14        On April 24, 2018, Plaintiff Andrew Howell filed a class action on behalf of the hourly

15 employees at the Tracy facility, entitled *Howell v. Leprino Foods Company, et al*., Case No. 1:18-

16 cv-01404-JLT-BAM ("*Howell*"). On March 23, 2022, Judge Ishii granted class certification in

17 *Howell* on the on-call meal and rest break claims.  (*Howell*, 1:18-cv-1404, Doc. 108.)  The Court

18 related *Howell* to *Finder*.

19        ***Walter* Case**

20        On February 28, 2020, Charles Bates filed a nearly identical wage-and-hour class action

21 as *Howell*, which Leprino removed to federal court. The Court related *Bates* to *Howell*.  Then, on

22 August 16, 2022, Judge Ishii granted leave to substitute Charles Bates with Plaintiff Fred Walter

23 as the class representative in the case now entitled *Walter v. Leprino Foods Company, et al*., Case

24 No. 2:20-cv-00700-JLT-BAM ("*Walter*"). On April 25, 2023, Judge Ishii granted class

25 certification on claims for late and short meal breaks, on-call breaks, and on-duty meal period.

26 (*Walter*, 2:20-cv-00700, Doc. 62.)

27

28     [4] All page numbers refer to the CM/ECF pagination number.

**B. Events Leading to the Settlement in the Leprino Cases**

On March 14, 2023, the *Vasquez* case proceeded to a jury trial. At issue was whether Leprino had a facility-wide policy at its Lemoore West facility between May 8, 2013 and March 31, 2020 that required class members to be on-call during their meal and rest breaks. On April 6, 2023, the jury rendered a verdict for Leprino, finding that Leprino did not have a facility-wide policy at its Lemoore West facility and that the class was not required to be on-call during rest breaks or during meal breaks. (Doc. 430.)  Plaintiffs appealed the verdict on May 5, 2023, and Leprino filed a conditional cross-appeal in the event the Ninth Circuit did not affirm the verdict. (Docs. 436, 439.)

During the pendency of the *Vasquez* appeal, the parties participated in two (2) full-day, in-person mediation sessions with Ninth Circuit Mediator, Kyungah Kay Suk, on July 31, 2023, and September 18, 2023.  (Doc. 462 at 12.)  The parties had attempted previously to mediate the *Vasquez* case unsuccessfully on January 31, 2020, with a private mediator. After ten years of hard-fought litigation, the parties finally agreed to settle all of the Leprino Cases.  (*Id.*)

On October 16, 2023, Plaintiffs moved for preliminary approval of the settlement.  The Court held a hearing on the motion and requested supplemental briefing on several issues, including appointment of class counsel, requested attorneys' fees and costs.  Plaintiffs filed their supplemental briefing on February 4, 2024.  (Doc. 460.)

On February 12, 2024, the Court granted preliminary approval of the class action settlement.  (Doc. 461.)  By its approval, the Court: (1) preliminarily approved the settlement; (2) conditionally certified the class; (3) appointed Plaintiffs Isaias Vasquez, Linda Hefke, Jerrod Finder, Jonathan Talavera, John Perez, Andrew Howell, and Fred Walter as Class Representatives; (4) appointed the Parris Law Firm and The Downey Law Firm, LLC as Class Counsel; (5) appointed Phoenix Class Action Administration Solutions ("Phoenix") as Settlement Administrator; (6) preliminarily approved Class Counsel attorneys' fees and costs; (7) preliminarily approved the Plaintiffs' Enhancement Payments in the total amount of $45,000; (8) approved the Class Notice; (9) directed that notice be disseminated pursuant to the terms of the settlement; (10) preliminarily approved the proposed procedure for class members to request

1    exclusion and object to the settlement; and (11) set a final fairness hearing.  (*Id.*)  The settlement

2    class was defined as: All individuals who currently or formerly worked at Leprino's Lemoore

3    West, Lemoore East, or Tracy facilities in the State of California as hourly, non-exempt

4    employees at any time between November 15, 2009 and July 31, 2023.  (*Id.* at 39.)

5        On February 15, 2024, the Settlement Administrator received a data file from defense

6    counsel that contained the names, last known mailing addresses, social security numbers, dates of

7    employment, and workweeks for each Class Member during the Class Period ("Class List").  The

8    data list contained 3,439 individuals identified as Class Members.  (Doc. 462-10, Declaration of

9    Kevin Lee ("Lee Decl.") ¶ 3.)

10       On February 22, 2024, the Settlement Administrator conducted a National Change of

11   Address ("NCOA") search in an attempt to update the Class List of mailing addresses as

12   accurately as possible.  Per the Settlement Administrator, the database provides updated addresses

13   of any individual who has moved in the previous four (4) years and notified the U.S. Postal

14   Service of their change of address.  (Lee Decl. ¶ 4.)  On the same date, the Settlement

15   Administrator mailed the Class Notice to all 3,439 Class Members. (*Id.*, ¶ 5.)  As of April 18,

16   2024, thirty-nine Notices were returned to the Settlement Administrator without a forwarding

17   address.  The Settlement Administrator attempted to locate a current mailing address using

18   TransUnion TLOxp, which the Settlement Administrator declares is "one of the most

19   comprehensive address databases available for skip tracing."  (*Id.*, ¶ 6.)  Of the thirty-nine

20   Notices that were skip traced, thirty-nine updated addresses were obtained, and the Notice was re-

21   mailed to those class members.  As of April 18, 2024, no Notices were considered undeliverable.

22   (*Id.*, ¶¶ 6-7.)  The Settlement Administrator received one (1) Request for Exclusion from Class

23   Member Sam Cam.  (*Id.*, ¶ 8.)  The Settlement Administrator did not receive any objections or

24   any Workweek disputes from Class Members.  (*Id.*, ¶¶ 9-10.)  The deadline for exclusions,

25   objections, and disputes was April 8, 2024.  (*Id.*, ¶¶ 8-10.)

26       On April 18, 2024, Plaintiffs filed the instant motion for final approval of the class action

27   settlement. (Doc. 462.)  According to the motion and supporting declarations, there are 3,438

28   participating Class Members, representing 99.97% of the Class.  These participating Class

1    members have worked a collective total of 998,442 Workweeks during the Class Period.  (Lee

2    Decl. ¶ 11.)  The Net Settlement Amount is estimated to be $1,18,876.92 for distribution, the

3    highest pre-tax Individual Settlement Payment to be paid is approximately $848.32, while the

4    average pre-tax Individual Settlement Payment to be paid is approximately $344.50.  (*Id.*, ¶ 13.)

5    Leprino filed a statement of non-opposition to the motion on May 2, 2024.  (Doc. 463.)

6          On May 14, 2024, Bowles filed his objections to final approval of the settlement

7    agreement.  (Doc. 468.)  Bowles, who currently maintains a related action against Leprino in the

8    matter of *Bowles v. Leprino*, 1:19-cv-635-JLT-BAM, requests that he (1) be granted leave to opt

9    out of the settlement in this case as a Class Member as a matter of right; or (2) be excluded from

10   this settlement or, in the alternative, (3) be granted leave to intervene as a matter of right and/or

11   for permissive intervention.  (Doc. 468.)  Plaintiffs and Leprino both filed responses to Bowles's

12   objections.  (Docs. 473, 474.)  Counsel for Bowles appeared at the hearing for final approval.  No

13   other objectors appeared or otherwise submitted objections.

14      **C. Summary of Settlement Terms**

15         **1.  Payment Terms**

16          Under the terms of the Settlement Agreement, Leprino has agreed to pay a total maximum

17   settlement fund of $3,500,000.00 ("Maximum Settlement Amount") to resolve the claims of all

18   individuals who currently or formerly worked at Leprino's Lemoore West, Lemoore East, or

19   Tracy facilities in the State of California as hourly, non-exempt employees at any time between

20   November 15, 2009 and July 31, 2023.  (Doc. 462-1, Ex. 1, Settlement Agreement and Release

21   ("Settlement Agreement") ¶ 53.)

22          The following amounts, in addition to the Employer Tax Portion, will be deducted from

23   the Maximum Settlement Amount:

24          (1)    payment of attorneys' fees ($1,400,000) and costs ($800,000) to Class Counsel,

25          (2)    Settlement Administration Costs ($25,375.94),

26          (3)    the PAGA Settlement ($10,000), and

27

28

1          (4)        the Plaintiff Enhancement Payments ($45,000).[5]

2    (Settlement Agreement ¶¶ 5, 27, 29, 35, 47, 57.)  All funds remaining after deduction of the

3    Plaintiff Enhancement Payments ($45,000), Attorneys' Fees ($1,400,000), Costs ($800,000), the

4    California Labor and Workforce Development Agency's share of the PAGA Settlement ($7,500),

5    and Settlement Administration Costs ($25,375.94) will result in a pre-tax Net Settlement Amount

6    of $1,222,124.06.[6]  (Doc. 462 at 13 ("pre-tax Net Settlement Amount of $1,222,124.06").)  The

7    Net Settlement Amount will be paid out to all Class Members who did not submit a Request for

8    Exclusion, on a pro-rata basis based on the total number of Workweek(s) employed by each Class

9    Member as a non-exempt, hourly employee at any time during the Class Period.  (Settlement

10   Agreement ¶ 62.)  Each Individual Settlement Payment shall be calculated by dividing the Class

11   Member's total number of Workweek(s) employed as an hourly, non-exempt employee of

12   Leprino in the State of California during the Class Period as reflected in Defendants' records by

13   the total number of Workweek(s) for all Class Members employed as hourly, non-exempt

14   employees of Leprino in the State of California during the Class Period. The resulting number

15   shall be multiplied by the Net Settlement Amount to arrive at each Individual Settlement

16   Payment.  (*Id.*)

17       **2.   <u>Releases</u>**

18       Class Members who do not timely submit a Request for Exclusion release Leprino from

19   the "Released Class Claims." (Settlement Agreement ¶ 78.)  "Released Class Claims" means:

20           all claims under state, federal or local law, whether statutory, common law or
21           administrative law, alleged in the operative complaints in the Action,  or that could
             have been alleged based on the factual allegations in the operative complaints in
22           the Action, including: (1) Failure to Pay Minimum Wage; (2) Failure to Pay
             Overtime Wages; (3) Failure To Provide Meal Periods and Failure to Pay One Hour
23           of Pay at Regular Rate of Compensation; (4) Failure To Provide Rest Periods and

24   _____
     [5] The Settlement Agreement identifies Plaintiff Enhancement Payments totaling $50,000 for the class
     representatives.  In supplemental briefing, Plaintiffs have withdrawn the $5,000 requested Enhancement
25   Payment for Ronald Null, leaving a total of $45,000 in Plaintiff Enhancement Payments.
     [6] "The Net Settlement Amount shall be determined by deducting the following amounts from the
26   Maximum Settlement Amount of $3,500,000.00: (1) Class Counsel's Attorneys' Fees and Costs, approved
     by the Court; (2) Employer Tax Portion; (3) the Settlement Administration Costs not to exceed
27   $25,375.94; (4) the Plaintiff Enhancement Payments; and (5) $7,500.00 to the California Labor and
     Workforce Development Agency for its share of the penalties pursuant to the Private Attorneys General
28   Act of 2004 ("Labor & Workforce Development Agency Payment")."  (Settlement Agreement ¶ 61).)

Failure to Pay One Hour of Pay at Regular Rate of Compensation; (5) Failure to Furnish Accurate Wage Statements; (6) Failure to Pay Earned Wages Upon Termination; (7) Conversion; and (8) Unfair Competition in Violation of California Business and Professions Code Section 17200, et seq., including, but not limited to, claims for injunctive relief; punitive damages; liquidated damages, penalties of any nature; interest; fees; costs; and all other claims and allegations made or which could have been made based on the allegations in the operative complaints in the Action, from November 15, 2009 through the Release Date. The released claims specifically include all claims for alleged violations of California Labor Code sections 201, 202, 203, 204, 210, 218, 218.5, 218.6, 225.5, 226, 226.3, 226.6, 226.7, 510, 512, 558, 1174, 1194, 1194.2, 1197.1, 1198, and 2699; California Code of Civil Procedure sections 382 and 1021.5, and applicable Wage Order(s).

(Settlement Agreement ¶ 43.)

The release for Plaintiffs Vasquez, Hefke, Finder, Talavera, Perez, Howell, and Walter encompasses more claims than those of the Settlement Class Members. They have agreed to a general release of any claims known and unknown against Leprino. (Settlement Agreement ¶ 80.)

**3.  Objections and Opt-Out Procedure**

The Notice explained to class members that they did not have to do anything to receive money from this settlement. (Doc. 462-10, Lee Decl. at Ex. A.) However, any class member could file objections to the terms of the settlement or request exclusion from the settlement class. (*Id.*) The Notice explained the procedures to object to the terms and request exclusion, and informed individuals that any objections or request for exclusion were to be postmarked no later than April 8, 2024. (*Id.*)

**4.  Service of the Class Notice Packets and Responses Received**

On February 22, 2024, the Settlement Administrator mailed the Class Notice to all 3,439 Class Members via the United States Postal Service. (Lee Decl. ¶ 5.) Kevin Lee, a case manager at Phoenix, reports that the Settlement Administrator received one (1) request for exclusion and no objections from class members. (Lee Decl. ¶¶ 8, 9.) As indicated, the Court also received Bowles's objection to the Settlement.

**APPROVAL OF CLASS SETTLEMENT**

When parties settle the action prior to class certification, the Court has an obligation to "peruse the proposed compromise to ratify both the propriety of the certification and the fairness

of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). Approval of a class

settlement is generally a two-step process. First, the Court must assess whether a class exists. *Id.*

(citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)). Second, the Court must

"determine whether the proposed settlement is fundamentally fair, adequate, and reasonable." *Id.*

(citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 2998)). The decision to approve

or reject a settlement is within the Court's discretion. *Hanlon*, 150 F.3d at 1026.

## I.    Certification of the Settlement Class[7]

To certify a class, a party must demonstrate that all of the prerequisites of Federal Rule of

Civil Procedure 23(a), and at least one of the requirements of Rule 23(b) has been met. *Wang v.

Chinese Daily News, Inc.*, 737 F.3d 538, 542 (9th Cir. 2013); *see also Valentino v. Carter-

Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

### A.  Rule 23(a) Requirements

Under Rule 23(a), certification of a class is proper if:

> (1) the class is so numerous that joinder of all members is impracticable; (2)
> there are questions of law or fact common to the class; (3) the claims or
> defenses of the representative parties are typical of the claims or defenses
> of the class; and (4) the representative parties will fairly and adequately
> protect the interest of the class.

Fed. R. Civ. P. 23(a)(1)–(4).  These factors are known as "numerosity," "commonality,"

"typicality," and "adequacy of representation."  *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147,

156 (1982). Assessing these requirements involves "rigorous analysis" of the evidence. *Wal-Mart

Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).

### 1.  Numerosity

Numerosity is met if "the class is so numerous that joinder of all members is

impracticable." Fed. R. Civ. P. 23(a)(1). There is no absolute number or cut-off for determining

numerosity, and the specific facts of each case may be examined. *Schwarm v. Craighead*, 233

F.R.D. 655, 660 (E.D. Cal. 2006); *Cervantez v. Celestica Corp.*, 253 F.R.D. 562, 569 (C.D. Cal.

---

[7] "Because the class was only conditionally certified upon preliminary approval of the Settlement, final
certification of the Settlement Class is required."  *Conti v. L'Oreal USA S/D, Inc.*, No. 1:19-cv-0769 JLT
SKO, 2023 WL 4600532, at *6 n.5 (E.D. Cal. July 18, 2023).

2008) ("Courts have not required evidence of specific class size or identity of class members to satisfy the requirements of Rule 23(a)(1)."). "[C]ourts generally find that the numerosity factor is satisfied if the class comprises 40 or more members and will find that it has not been satisfied when the class comprises 21 or fewer." *Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544, 549 (N.D. Cal. 2007); *see also Cervantez*, 253 F.R.D. at 569 ("Courts have held that numerosity is satisfied when there are as few as 39 potential class members."). The Settlement Administrator reports that there are 3,439 Class Members, with 3,438 of those members participating in the settlement. (Lee Decl. ¶¶ 3, 11.) Joinder of more than 3,400 Class Members is impracticable, and the numerosity requirement is satisfied.

## 2.   Commonality

Commonality requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Parties seeking class certification must prove their claims depend on a common contention of such a nature it is capable of class-wide resolution, meaning the determination of its truth or falsity will resolve an issue central to the validity of each claim at once. *Wal-Mart*, 564 U.S. at 350. Class-wide proceedings must generate common answers to common questions of law or fact apt to drive resolution of the litigation. *Id.* The parties must demonstrate class members have suffered the same injury. *Id.* at 349-350.

Plaintiffs identify common contentions and demonstrate that class members suffered the same injury. The common questions across the class include the certified questions of whether Leprino had an on-call policy at its facilities that deprived Class Members of meal and rest breaks, whether Leprino failed to provide second meal breaks, whether Leprino had a timekeeping policy that rounded punches resulting in late and short meal breaks, whether Leprino's policies resulted in Class Members donning and doffing off the clock, and also include the questions on which Plaintiffs would still seek certification, including, whether Leprino failed to pay minimum wage, failed to pay overtime wages, failed to pay appropriate premium pay for meal or rest breaks not provided, failed to furnish accurate wage statements, or failed to pay earned wages at termination. (Doc. 462 at 27.) Certification has already been granted in the *Vasquez, Perez, Howell,* and *Walter* cases on some of these common policies. Certification of the

1    Settlement Class is appropriate because Leprino engaged in uniform practices with respect to the

2    Class Members.  *Hanlon*, 150 F.3d at 1022.

3                    **3.   Typicality**

4         Rule 23 also requires that "the claims or defenses of the representative parties are typical

5    of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Under Rule 23's permissive

6    standard, claims "need not be substantially identical," but are typical if the representative's claims

7    are "reasonably co-extensive with those of the absent class members." *Parsons v. Ryan*, 754 F.3d

8    657, 685 (9th Cir. 2014) (quoting *Hanlon*, 150 F.3d at 1020). Typicality is based on the "nature of

9    the claim or defense of the class representative, and not to the specific facts from which it arose or

10   the relief sought." *Parsons*, 754 F.3d at 685 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d

11   497, 508 (9th Cir. 1992)). Typicality tests "whether other members have the same or similar

12   injury, whether the action is based on conduct which is not unique to the named plaintiffs, and

13   whether other class members have been injured by the same course of conduct." *Id.* (quoting

14   *Hanon*, 976 F.2d at 508).  The requirements of commonality and typicality occasionally merge,

15   and "[b]oth serve as guideposts for determining whether under the particular circumstances

16   maintenance of a class action is economical and whether the named plaintiff's claim and the class

17   claims are so interrelated that the interests of the class members will be fairly and adequately

18   protected in their absence." *Id.* (quoting *Wal-Mart*, 564 U.S. at 349 n.5).

19        The Court finds the typicality requirement is satisfied as Plaintiffs' claims arise from the

20   same factual bases and are premised upon the same legal theories as those applicable to the class

21   members. Plaintiffs, like every other class member, were employed by Leprino as non-exempt

22   employees and, like every other class member, were allegedly subject to the same employment

23   practices.

24                    **4.   Adequacy of Representation**

25        The Court must ensure "the representative parties will fairly and adequately protect the

26   interests of the class." Fed. R. Civ. P. 23(a)(4). In determining whether the named plaintiffs will

27   adequately represent the class, courts must resolve two questions: "(1) do the named plaintiffs and

28   their counsel have any conflicts of interest with other class members and (2) will the named

12

1  plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis v. Costco*

2  *Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (quoting *Hanlon*, 150 F.3d at 1020).

3  a. *Class representative*

4  The Court previously appointed certain of the Plaintiffs as class representatives when it

5  certified classes in *Vasquez* (Isaias Vasquez and Linda Hefke), *Perez* (John Perez), *Howell*

6  (Andrew Howell), and *Walter* (Fred Walter).  Plaintiffs submit they have no conflicts of interest

7  with other class members because they allegedly suffered the same violations as all other class

8  members.  (*See*, *e.g.*, Doc. 462-3, Finder Decl. ¶ 10 ("My interests as a named plaintiff in the

9  lawsuit are not adverse to the interests of the other employees.  I do not have any conflicts with

10  any of the other employees at Leprino. . . . I brought this case so I could help the other employees

11  correct the legal wrongs I believe Leprino committed."); Doc. 462-4, Talavera Decl. ¶ 9 (same), ¶

12  10 ("I have always put the best interests of the other employees first while performing my duties

13  as a potential leader in this case."); Doc. 462-5, Vazquez Decl. ¶ 11 ("My interests as a named

14  plaintiff in this lawsuit are not adverse to the interests of the other employees.  I do not have any

15  conflicts with any of the other employees at Leprino. "); Doc. 462-6, Hefke Decl. ¶ 11 ("I do not

16  have any conflicts with any of the other employees at Leprino. . . . I brought this case so I could

17  help the other employees correct the legal wrongs I believe Leprino committed."); Doc. 462-7,

18  Perez Decl. ¶ 9 (same); ¶ 10 ("I have always put the best interests of the other employees first

19  while performing my duties as a potential leader in this case."); Doc. 462-8, Howell Decl. ¶ 9 ("I

20  brought this case so I could help the other employees correct the legal wrongs I believe Leprino

21  committed."); Doc. 462-9, Walter Decl. ¶ 9 ("I do not have any conflicts with any of the other

22  employees at Leprino. . . . I brought this case so I could help the other employees correct the legal

23  wrongs I believe Leprino committed.").)  Plaintiffs assert that they have fairly represented all

24  class members, and they remain willing to vigorously prosecute the Leprino Cases to the benefit

25  of the Class.  (Doc. 462 at 29.)

26  The parties have not identified conflicts between Plaintiffs Vasquez, Hefke, Finder,

27  Talavera, Perez, Howell, and Walter and the settlement Class Members.  Plaintiffs have actively

28  prosecuted claims on behalf of the class and their interests align with those of class members.

13

1    The Court finds that Plaintiffs fairly and adequately represented the interests of the class.

2                                *b.  Class counsel*

3          The Parris Law Firm and The Downey Law Firm, LLC were appointed as Class Counsel

4    at the preliminary approval stage.  Counsel aver that they "have extensive experience in complex

5    wage and hour litigation."  (Doc. 462 at 29.)  Class Counsel have extensive experience in class

6    actions and complex litigation, including many wage-and-hour cases (*see* Doc. 462-1, Szeto Decl.

7    Ex. 11  and ¶ 20; Doc. 462-2, Downey Decl. ¶ 2 and Ex. A), there is no evidence of any potential

8    conflicts, and they have prosecuted the Leprino Cases for over a decade. Leprino made no

9    objection to the appointment.  The Court finds Class Counsel met the adequacy requirement.

10          For the foregoing reasons, the Court finds that the requirements of Rule 23(a) are

11    satisfied.

12        **B.  Rule 23(b)(3)**

13          A class may only be certified if it also is maintainable under Rule 23(b). Fed. R. Civ. P.

14    23(b); *see also Wang.*, 737 F.3d at 542 ("A party seeking class certification must satisfy the

15    requirements of Federal Rule of Civil Procedure 23(a) and the requirements of at least one of the

16    categories under Rule 23(b).").  Plaintiffs contend that certification is appropriate under Rule

17    23(b)(3).  (Doc. 462 at 27.)

18          A class is maintainable under Rule 23(b)(3) if (1) "questions of law or fact common to the

19    members of the class predominate over any questions affecting only individual members" and (2)

20    "a class action is superior to other available methods for fair and efficient adjudication of the

21    controversy." Fed. R. Civ. P. 23(b)(3). These are referred to as the "predominance" and

22    "superiority" requirements.  *Wal-Mart*, 564 U.S. at 363 ("(b)(3) requires the judge to make

23    findings about predominance and superiority before allowing the class").

24                         **1.  Predominance**

25          "The first requirement of Rule 23(b)(3) is predominance of common questions over

26    individual ones." *Valentino*, 97 F.3d at 1234.  The predominance inquiry "trains on the legal or

27    factual questions that qualify each class member's case as a genuine controversy, questions that

28    preexist any settlement," and "tests whether proposed classes are sufficiently cohesive to warrant

                                        14

1  adjudication by representation." *Amchem Prod.*, 521 U.S. at 594. If a common question will drive

2  the resolution of the litigation, the class is sufficiently cohesive. *Jabbari v. Farmer*, 965 F.3d

3  1001, 1005 (9th Cir. 2020) (court must determine which questions are likely "to drive the

4  resolution of the litigation.)

5        Plaintiffs contend that common questions of law or fact predominate over individual

6  questions pursuant to Rule 23(b)(3).  (Doc. 462 at 27.)  The challenged Leprino policies and

7  practices apply uniformly across all Class Members at Leprino's three facilities. There are no

8  individualized inquiries, and the same common legal questions qualify each Class Member's case

9  as a genuine controversy such that the proposed class is sufficiently cohesive to warrant

10  adjudication by representation.  The issues are common to the class: whether it was Leprino's

11  standard practice and policy to fail to pay minimum wage, fail to pay overtime wages, fail to pay

12  appropriate premium pay for meal or rest breaks not provided, fail to furnish accurate wage

13  statements, or fail to pay earned wages at termination.  Other issues similarly predominate:

14  whether Leprino had an on-call policy at its facilities that deprived Class Members of meal and

15  rest breaks, whether Leprino failed to provide second meal breaks, whether Leprino had a

16  timekeeping policy that rounded punches resulting in late and short meal breaks, and whether

17  Leprino's policies resulted in Class Members donning and doffing off the clock.  These are

18  questions of law and fact subject to common proof that would predominate over individualized

19  inquiries.  Either such policies existed as to all Class Members or they did not. Given that

20  common policies apply to the class, the Court finds questions of law or fact common to the class

21  members predominate over any questions affecting only individual members.

22        **2.  Superiority**

23        "Where classwide litigation of common issues will reduce litigation costs and promote

24  greater efficiency, a class action may be superior to other methods of litigation. A class action is

25  the superior method for managing litigation if no realistic alternative exists." *Valentino*, 97 F.3d

26  at 1234–35. Factors relevant to the superiority requirement under Rule 23(b)(3) include:

27          (A)    the class members' interests in individually controlling the prosecution or
             defense of separate actions;

28

(B)     the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)     the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3); *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir.), opinion amended on denial of reh'g, 273 F.3d 1266 (9th Cir. 2001) ("In determining superiority, courts must consider the four factors of Rule 23(b)(3).") "A consideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser*, 253 F.3d at 1190.

### a.  Class members' interest in individual litigation

First, the Court considers "the class members' interests in individually controlling the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). This factor is most relevant when class members "suffered sizeable damages or [have] an emotional stake in the litigation." *McKenzie v. Fed. Express Corp.*, 275 F.R.D. 290, 301 (C.D. Cal. 2011). "Where damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action." *Zinser,* 253 F.3d at 1190.

As reported by the Settlement Administrator, there was only one request for exclusion and no objections to the settlement.  (Lee Decl. ¶¶ 8-9.)  Objector Bowles also requests to be excluded from the Class.  (Doc. 468.)  Nevertheless, the Court finds no indication that the majority of Class Members seek to control this action or litigate a separate action.  The payments to Class Members are not sizable or large.  The average estimated pre-tax payment is $344.50, while the highest estimated pre-tax payment is $848.32.  (Lee Decl. ¶ 13.)  It is unlikely that individuals would pursue these relatively small claims.  *See Conti*, 2023 WL 4600532, at *9 (concluding it was unlikely individuals would pursue small claims with an estimated average payment of $584.59, with a highest payment of $2,849.49).

### b.  Other litigation

Second, the Court considers "the extent and nature of any litigation concerning the

16

1   controversy already begun by or against class members." Fed. R. Civ. P. 23(b)(3)(B).  Here,

2   there appears to be other litigation related to the claims encompassed in this settlement. At a

3   minimum, there is the related case of *Bowles v. Leprino*, No. 1:19-cv-00635-JLT-BAM, which is

4   a putative class and representative PAGA action against Leprino.  Bowles is a class member.

5   (*See* Doc. 468 at 5.)  This factor therefore slightly weighs against class certification.

6                          *c.   Concentration in one forum*

7        Third, the Court considers "the desirability or undesirability of concentrating the litigation

8   of the claims in the particular forum."  Fed. R. Civ. P. 23(b)(3)(C).

9        There is no suggestion the Eastern District is an undesirable forum for the matter, which

10   raises wage and hour claims under California law on behalf of employees who worked at

11   Leprino's Lemoore West, Lemoore East, and Tracy facilities located in California.  *See Conti*,

12   2023 WL 4600532, at *10 (concluding this factor weighed in favor of certification where

13   settlement raised wage and hour claims under California law on behalf of employees throughout

14   the state).  Further, "[w]ith the parties already having agreed on a proposed Settlement

15   Agreement, the desirability of concentrating the litigation in one forum is obvious." *Wright v.*

16   *Linkus Enters.*, 259 F.R.D. 468, 474 (E.D. Cal. 2009) (internal quotation marks, citation omitted).

17   This factor therefore weighs in favor of certification.

18                          *d.   Management of the action*

19        Finally, the Court considers "the likely difficulties in managing a class action."  Fed. R.

20   Civ. P. 23(b)(3)(D).  Because the parties reached an agreement for the class claims and identified

21   the Settlement Class, it does not appear there are any problems with managing the action.  *See*

22   *Conti*, 2023 WL 4600532, at *10.  This factor therefore weighs in favor of certification.

23        For the foregoing reasons, the Court finds that the relevant factors generally weigh in

24   favor of certification and that Plaintiffs have sufficiently met the requirements of Rule 23(a) and

25   (b).

26   **II.   Evaluation of the Settlement Terms**

27        Class actions require court approval prior to settlement. Fed. R. Civ. P. 23(e) ("The

28   claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or

17

compromised only with the court's approval."). A class action settlement may be approved if the

Court, after class members have an opportunity to be heard, finds that the settlement is "fair,

reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  Rule 23(e)(2) directs the Court to consider

whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2); *see Briseño v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021)

("Congress and the Supreme Court amended Rule 23(e) to set forth specific factors to consider in

determining whether a settlement is 'fair, reasonable, and adequate.'"); *see also Farrar v.

Workhorse Grp., Inc.*, No. CV 21-02072-CJC (PVCx), 2023 WL 5505981, at *4 (C.D. Cal. July

24, 2023) (applying Rule 23(e)(2) factors to evaluate fairness of class action settlement); *Lusk v.

Five Guys Enterprises LLC*, No. 1:17-cv-0762 JLT EPG, 2023 WL 4134656, at *12 (E.D. Cal.

June 22, 2023) (applying Rule 23(e)(2) factors to evaluate whether settlement of class action

"fair, reasonable, and adequate"); *Razo v. AT&T Mobility Servs., LLC*, No. 1:20-cv-0172 JLT

HBK, 2022 WL 4586229, at *8 (E.D. Cal. Sept. 29, 2022) (same).

District courts in the Ninth Circuit also consider the following non-exhaustive list of

factors ("*Churchill* factors"): (1) the strength of the plaintiffs' case; (2) the risk, expense,

complexity, and likely duration of further litigation; (3) the risk of maintaining class action status

throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed

and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a

18

1   governmental participant; and (8) the reaction of the class members to the proposed settlement.

2   *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *see also Hang v. Old*

3   *Dominion Freight Line, Inc.*, No. 5:21-cv-00287-JWH-DTBX, 2024 WL 2191930, at *3 (C.D.

4   Cal. May 14, 2024) (indicating that in Ninth Circuit courts also consider the eight *Churchill*

5   factors); *Mostajo v. Nationwide Mut. Ins. Co.*, No. 2:17-cv-00350-DAD-AC, 2023 WL 2918657,

6   at *4 (E.D. Cal. Apr. 12, 2023) (citing *Churchill*, 361 F.3d at 575). These settlement factors are

7   non-exclusive, and each need not be discussed if they are irrelevant to a particular case. *Mostajo*,

8   2023 WL 2918657, at *4.

9           **A.  Representation of the Class**

10          The Court is required to consider whether "the class representatives and class counsel

11  have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). Because Plaintiffs carried

12  the burden to show the adequacy prerequisite was satisfied under Rule 23(a), the Court finds the

13  requirement under Rule 23(e)(2) also is satisfied. *See Conti*, 2023 WL 4600532, at *11

14  (determining Rule 23(e)(2) adequacy requirement satisfied where plaintiffs carried the burden to

15  show the adequacy perquisite satisfied under Rule 23(a)).

16          **B.  Negotiation of the Settlement**

17          The Court must consider whether "the proposal was negotiated at arm's length." Fed. R.

18  Civ. P. 23(e)(2)(B). The Ninth Circuit also "put[s] a good deal of stock in the product of an arms-

19  length, non-collusive, negotiated resolution" in evaluating a proposed class action settlement.

20  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). "Where a class action is settled

21  prior to class certification, the Court must also consider whether there is evidence of collusion or

22  other conflicts of interest before approving the settlement." *Rodriguez v. Danell Custom*

23  *Harvesting, LLC*, 327 F.R.D. 375, 389 (E.D. Cal. 2018) (citing *In re Bluetooth Headset Products*

24  *Liability Litigation*, 654 F.3d 935, 946 (9th Cir. 2011)). Examples of signs that a settlement is the

25  product of collusion include "(1) when counsel receive a disproportionate distribution of the

26  settlement, or when the class receives no monetary distribution but class counsel are amply

27  rewarded; (2) when the parties negotiate a 'clear sailing' arrangement providing for the payment

28  of attorneys' fees separate and apart from class funds ...; and (3) when the parties arrange for fees

19

1   not awarded to revert to defendants rather than be added to the class fund." *Id.* (quoting *In re*

2   *Bluetooth*, 654 F.3d at 947).

3        Here, the settlement was presented to the Court only after the parties had engaged in two

4   arms-length mediation sessions with Ninth Circuit mediator, Kyungah Kay Suk, while the

5   *Vasquez* case was pending on appeal after a jury verdict.

6                   1.   Whether there is a disproportionate distribution to counsel

7        The Settlement Agreement provides that Class Counsel may seek an amount not to exceed

8   forty percent of the Gross Settlement Fund.  (Settlement Agreement ¶ 55.)  The typical range of

9   acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value,

10  with 25% considered the benchmark. *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000).

11  The percentage may be adjusted upward or downward based on (1) the results achieved; (2) the

12  risks of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the

13  fee; (5) the burdens carried by counsel; and (6) the awards made in similar cases. *Vizcaino v.*

14  *Microsoft Corp.*, 290 F.3d 1043, 1048–50 (9th Cir. 2002).  As the Court examined upon

15  preliminary approval, and as discussed below, the requested fee amount is not unreasonable, and

16  the Court does not find that the Settlement Agreement provides a disproportionate distribution to

17  Class Counsel.

18                  2.   Existence of a "clear sailing" agreement

19       In general, a "clear sailing" provision is one in which the parties agree to the "payment of

20  attorneys' fees separate and apart from class funds." *In re Bluetooth*, 654 F.3d at 947. A "clear

21  sailing" arrangement also exists when a defendant expressly agrees not to oppose an award of

22  attorneys' fees up to an agreed upon amount. *Id.*

23       Class Counsel is not seeking attorneys' fees separate and apart from the class funds.

24  Rather, the amount requested is to be deducted from the Gross Settlement Amount.  (Settlement

25  Agreement ¶¶ 55.)  However, Leprino has agreed not to oppose any application or motion by

26  Class Counsel for attorneys' fees and costs. (*Id.*)  As the Court previously determined on

27  preliminary approval, given the longevity of the Leprino Cases, the hard-fought nature of the

28  litigation, including substantial motion practice and a jury trial, this clear sailing agreement is not

1    a substantial concern.  A court is always concerned with "the potential that [Defendants] agreed

2    to pay class counsel excessive fees in exchange for counsel accepting a lower amount for the

3    class members." *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 610 (9th Cir. 2021) (quoting

4    *Briseño*, 998 F.3d at 1027).  In this instance, the Court does not believe that Plaintiffs' counsel is

5    getting a windfall by unreasonably high fees nor acting to the disadvantage of the class.  This is

6    particularly true given the resulting jury verdict in *Vasquez*, which afforded no recovery to the

7    class.  Accordingly, the Court does not find that the clear sailing provision weighs against final

8    approval, nor does it support a finding of collusion.

9                              3.   Whether there is a reversion to defendant

10       The parties did not agree or otherwise arrange for unawarded fees to revert to Leprino.

11   Instead, the parties agreed that the Gross Settlement Fund is "an all-in common fund settlement.

12   There will be no reversion of any portion of the Gross Settlement Fund to [Leprino]."

13   (Settlement Agreement ¶ 24.)  Additionally, the parties acknowledged that the Court might

14   approve an amount in fees less than requested and that any unawarded fees or costs would be

15   included in the Net Settlement Amount and distributed *pro rata* to participating Class Members.

16   (Settlement Agreement ¶¶ 55.)  Because any unawarded fees will be distributed to Class

17   Members, this factor does not support a finding of collusion.

18       Upon consideration of the totality of the circumstances, the Court finds that the settlement

19   is the result of an arm's length negotiation and there is no evidence of collusion or other conflicts

20   of interest.

21       **C.  Relief Provided for the Class**

22       The third factor assesses whether the relief provided for the class is adequate, taking into

23   account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed

24   method of distributing relief to the class, including the method of processing class-member

25   claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

26   (iv) any agreement required to be identified under Rule 23(e)(3).  Fed. R. Civ. P. 23(e)(2)(C).

27                              1.   Costs, risks, and delays of further litigation

28       "A[ ] central concern [when evaluating a proposed class action settlement] ... relate[s] to

                                             21

1    the cost and risk involved in pursuing a litigated outcome." Fed. R. Civ. P. 23(e)(2), 2018

2    Advisory Comm. Notes.

3         Plaintiffs and Class Counsel believed in the strength of their case in the *Vasquez* matter

4    and spent a month trying to convince the jury that Leprino had policies and practices that

5    effectively placed Class Members on call during meal and rest breaks. (Doc. 462 at 15.)  The jury

6    disagreed and rendered a verdict in favor of Leprino. Plaintiffs appealed the verdict, but agreed to

7    stay the appeal to resolve the Leprino Cases.  (*Id.*)  Plaintiffs and Class Counsel indicate that they

8    are "well aware of the inherent risks involved in any appeal and the consequences flowing from a

9    ruling by the Ninth Circuit."  (*Id.*)  Class Counsel also recognize the risk of potentially losing the

10   *Vasquez* appeal and how that will very likely impact the remainder of the Leprino Cases.

11   Plaintiffs indicate that "a settlement of this considerable monetary amount is preferable to the

12   multi-tiered risks associated with proceeding with trial and a likely appeal, and is in the Class

13   Members' best interests. If Plaintiffs were to have rejected this multi-million dollar

14   common fund settlement, to achieve any recovery for Plaintiffs the three certified cases would

15   have to survive decertification, summary judgment, and proceed through more trials, and the

16   *Finder* and *Talavera* cases would have to be certified and the move through those other phases."

17   (*Id.*)

18        In contrast, were Plaintiffs to succeed in prevailing at trial on the other cases, the resulting

19   money judgment "will most definitely be subject to many rounds of appeals by Leprino, where,

20   again, both sides would face considerable risk – for Plaintiffs their hard-fought jury verdict could

21   be overturned, as could another favorable ruling for the defense. In addition, money judgments

22   must be bonded, and interest accrues during the pendency of appeal. The Class Members still

23   would not have yet received any money during the appeal process, and Class Counsel could have

24   to spend years defending its judgment in possibly several rounds of appeal."  (*Id.*at 16.)

25        Given the costs, risks, and delay of further litigation, including the *Vasquez* appeal, the

26   Court finds that the settlement of amount of $3,500,000.00 is adequate.

27             2.   Effectiveness of method of distributing relief

28        The Court must next consider "the effectiveness of any proposed method of distributing

1    relief to the class, including the method of processing class-member claims." Fed. R. Civ. P.

2    23(e)(2)(C). "Often it will be important for the court to scrutinize the method of claims

3    processing to ensure that it facilitates filing legitimate claims." Fed. R. Civ. P. 23(e), 2018

4    Advisory Comm. Notes. "A claims processing method should deter or defeat unjustified claims,

5    but the court should be alert to whether the claims process is unduly demanding." *Id.*

6         Class Members are not required to submit a claim to receive their settlement share.

7    (Settlement Agreement ¶ 36 ("'Participating Class Member' means any Class member who does

8    not submit a timely and valid Request for Exclusion.") and ¶¶ 59, 66.)  Instead, Class Members

9    only needed to take action if they wished to exclude themselves from the settlement, object to any

10   of the settlement terms, or dispute the number of workweeks.  (*Id.*, ¶¶ 73, 75-76.)  Because

11   submission of a claim form is not required, the proposed method of distribution is not "unduly

12   demanding" upon Class Members and will facilitate payment for legitimate claims.  *See Hang*,

13   2024 WL 2191930, at *5 (finding method for distributing relief adequate as funds would be

14   distributed to class members with no claim form requirement); *Conti*, 2023 WL 4600532, at *15

15   (finding proposed method of distribution not unduly demanding where class members not

16   required to take any action to receive their settlement share).  This factor therefore weighs in

17   favor of final approval.

18              3.   Attorneys' Fees

19        When evaluating the terms of a settlement, "courts must scrutinize 'the terms of any

20   proposed award of attorney's fees.'" *McKinney-Drobnis*, 16 F.4th at 607 (quoting Fed. R. Civ. P.

21   23(e)(2)(C)(iii). The Ninth Circuit explained, "the new Rule 23(e) makes clear that courts must

22   balance the 'proposed award of attorney's fees' vis-à-vis the 'relief provided for the class' in

23   determining whether the settlement is 'adequate' for class members." *Id.*, quoting *Briseño*, 998

24   F.3d at 1024.

25        The fees to which the parties agreed are above the benchmark and on the higher end of

26   fees approved in the Ninth Circuit, but are still within the range of acceptable fees. *See Cicero v.*

27   *DirecTV, Inc.*, EDCV 07-1182, 2010 WL 2991486, at *6 (C.D. Cal. July 27, 2010) ("California

28   cases in which the common fund is small, tend to award attorneys' fees above the 25%

1    benchmark . . . More particularly, a review of California cases in other districts reveals that

2    courts usually award attorneys' fees in the 30–40% range in wage and hour class actions that

3    result in recovery of a common fun[d] under $10 million."); *Rippee v. Bos. Mkt. Corp.*, No.

4    05cv1359 BTM (JMA), 2006 WL 8455400, at *4 (S.D. Cal. Oct. 10, 2006) (award of 40% of

5    $3,750,000 wage and hour class action settlement).  Here, the Court-approved payment shall be

6    made out of the Gross Settlement Fund by the Settlement Administrator within five (5) calendar

7    days after receiving the funding from Leprino.  (Settlement Agreement ¶ 55.)  In that same 5-day

8    period, the Settlement Administrator will issue the other approved payments, including to Class

9    Members. (*Id.*, ¶¶ 57, 59)  Thus, Class Counsel will receive their payment in the same period of

10   time as Class Members. The amount of fees and the timing of payment do not weigh against final

11   approval of the Class Settlement.

12                    4.   Agreement required to be identified

13           The Court must evaluate any agreement required to be identified under Rule 23(e)(3).

14   Fed. R. Civ. P. 23(e)(2)(C)(iv).  Specifically, "parties seeking approval must file a statement

15   identifying any agreement made in connection with the proposal." Fed. R. Civ. P. 23(e)(3).

16   Class Counsel have not identified any agreements except for the Settlement Agreement, which

17   the Court has considered for purposes of both preliminary and final approval.

18           **D.  Treatment of Class Members**

19           Rule 23(e)(2) requires the Court to consider whether the proposed settlement "treats class

20   members equitably relative to each other.  Fed. R. Civ. P. 23(e)(2)(D).

21           Class Members who did not request exclusion will receive a *pro rata* share of the Net

22   Settlement Amount, calculated by:

23               dividing the Class Member's total number of Workweek(s) employed as an hourly,
                 non-exempt employee of Leprino in the State of California during the Class Period
24               as reflected in Defendants' records by the total number of Workweek(s) for all
                 Class Members employed as hourly, non-exempt employees of Leprino in the State
25               of California during the Class Period. The resulting number shall be multiplied by
                 the Net Settlement Amount to arrive at each Individual Settlement Payment.
26

27   (Settlement Agreement ¶ 62.)

28           Because the Settlement Agreement provides for *pro rata* distribution to Class Members

                                                    24

based upon their number of workweeks, the agreement treats Class Members equitably, and supports final approval. *See Conti*, 2023 WL 4600532, at *16 (finding *pro rata* distribution to class members based upon number of workweeks treated class members fairly and citing cases).

Having found that all four factors under Rule 23(e)(2) favor settlement, the Court now turns to the relevant "*Churchill* factors" to evaluate the fairness of the settlement.

### E. Relevant *Churchill* factors

#### 1. <u>Strength of Plaintiffs' Case</u>

"An important consideration in judging the reasonableness of a settlement is the strength of plaintiffs' case on the merits balanced against the amount offered in the settlement." *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 488 (E.D. Cal. 2010).

Plaintiffs have vigorously litigated the Leprino Cases for almost ten years, the majority of which were certified. Plaintiffs indicate that in certifying the cases, the Court found that the cases raised common questions of law and fact regarding Leprino's employment policies and practices at each of its three facilities. (Doc. 462 at 15.)  Plaintiffs provided evidence and certified claims that Leprino had on-call policies at all three facilities effectively depriving Class Members of compliant meal and rest breaks, had policies that required employees to don and doff equipment off-the-clock, and had timekeeping policies that rounded time punches resulting in late and short meal periods.  (*Id.*)

Although Plaintiffs believe they could and would win their appeal in the *Vasquez* case, Class Counsel acknowledge the inherent risks involved in any appeal, along with the risk of potentially losing the *Vasquez* appeal and how that would likely impact the remainder of the Leprino Cases.  This factor weights in favor of approval.

#### 2. <u>Risk, Expense, Complexity, and Likely Duration of Further Litigation</u>

The second factor in assessing the fairness of the proposed settlement is the complexity, expense, and likely duration of the lawsuit if the parties had not reached a settlement agreement. *See Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).  This factor closely mirrors the requirement in Rule 23(e) concerning "the costs, risks, and delay of trial and appeal."  The Court therefore need not repeat its analysis.   As

25

1   discussed above, this factor weighs in favor of granting final approval.

2   **3.   The Amount Offered in Settlement**

3   As discussed at the preliminary approval stage, Plaintiffs estimate that the damages

4   exposure for the claims, other than the jury-rejected on-call and rest break claim, as follows:

5   -   potential damages for the off-the-clock claim in the Leprino Cases according to

6   Plaintiffs' expert's calculations equate to $353,079. (Doc. 461-1, Szeto Decl. at ¶ 9.)

7   -   damages for the late and short meal breaks resulting from Leprino's rounding

8   policy extrapolate out to roughly $279,167.88 in unpaid wages based on the 2,089.58 hours of

9   unpaid wages for the 25% sample Leprino provided for class certification, applying Plaintiff

10  Walter's hourly rate of $33.40.  (Doc. 462 at 18.)

11  -   damages for the second meal break claim across all three plants for the entire ten-

12  year Class Period are extrapolated to be approximately $1,279,350 based on Plaintiffs' expert's

13  analysis that 8,529 workdays from 2011 to 2015 reflected no second meal break recorded.  (*Id.*)

14  -   PAGA penalties for the initial violation equate to $330,000 for one Labor Code

15  violation. (*Id.*)

16  The parties have agreed to settle this action for a Gross Settlement Amount of

17  $3,500,000.00.  The net amount results in an average pre-tax recovery of  $344.50, with the

18  highest Individual Settlement Payment at $848.32.  (Lee Decl. ¶ 13.)  The Court has considered

19  Plaintiffs' expected recovery, as outlined above.  However, given that the jury rendered a

20  defense verdict in *Vasquez*, both the total possible exposure to Defendants and Plaintiffs'

21  expected recovery must be discounted when considering the realistic potential of achieving and

22  maintaining class certification and recovering under each of the theories in the various Leprino

23  Cases. As on preliminary approval, the Court continues to find that the settlement amount is

24  appropriate and weighs in favor of final approval.  *See*, *e.g.*, *Gallegos v. Atria Mgmt. Co.*, LLC,

25  2019 WL 13295795, at *6 (C.D. Cal. Jan. 28, 2019) (approving a wage and hour class settlement

26  with an average individual recovery of $51.22 per class member).

27  **4.   The Extent of Discovery Completed and the Stage of the Proceedings**

28  The global settlement was reached after a jury verdict and subsequent appeal in the

26

*Vasquez* matter and with the assistance of the Ninth Circuit mediator.  During the mediation, the parties exchanged information and discussed all aspects of the Leprino Cases including the risks and delays of further litigation, the risks to both parties, the evidence produced and analyzed, and the possible outcome of the Vasquez appeal and its effect on the other cases, among other things. (Doc. 462 at 16.)  Additionally, the parties had completed discovery for purposes of certification in the majority of the remaining actions.  The parties therefore had sufficient information to give them a sound understanding of the merits of their positions and to evaluate the worth of the claims in light of the *Vasquez* appeal.

The Court finds that consideration of this factor weighs in favor of final approval of the settlement. *See Rodriguez*, 327 F.R.D. at 388 ("The fact that the parties believe they engaged in sufficient discovery to weigh the merits of the action and engaged the services of a professional mediator in settling the action weighs in favor of approving the class action settlement.")

### 5.  The Experience and Views of Counsel

In determining whether a settlement is fair and reasonable, the Court is to accord great weight to the recommendation of counsel because they are aware of the facts of the litigation and in a better position than the court to produce a settlement that fairly reflects the parties' expected outcome in the litigation. *Rodriguez*, 327 F.R.D. at 388–89.  Class Counsel have extensive experience in class actions and complex litigation, including many wage-and-hour cases.  In light of the potential risk of the *Vasquez* appeal and the possibility of a defense verdict in the remainder of the Leprino Cases, Class Counsel believes that the $3,500,000.00 Maximum Settlement Amount is within a reasonable range given the uncertainties of success as well as the costs in terms of both time and expense in litigating the rest of the Leprino Cases.  (Doc. 462 at 18.)  This factor accordingly weighs in favor of final approval of the settlement.

### 6.  The Reaction of the Class Members to the Proposed Settlement

The response by the class generally has been positive. "It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 532, 529 (C.D. Cal. 2004) (citing cases).

Here, there was only one request for exclusion and one objection, which the Court addresses below.  These low rates of objections and opt outs are "indicia of the approval of the class." *Chavez v. PVH Corp.*, 2015 WL 9258144, at *2 (N.D. Cal. Dec. 18, 2015) (finding indicia of approval when 4 class members out of 9,474 opted out (approximately 0.04% of the Class) and none submitted timely objections).

For these reasons that Court finds that the Settlement is fair, adequate, and reasonable.

**III.    Objections and Request for Intervention**

Bowles filed objections to final approval of the settlement agreement.  (Doc. 468.)  As indicated, Bowles requests that he (1) be granted leave to opt out of the settlement in this case as a Class Member as a matter of right; or (2) be excluded from this settlement or, in the alternative; (3) be granted leave to intervene as a matter of right and/or for permissive intervention.  (Doc. 468.)  Plaintiffs and Leprino both filed responses to Bowles's objections.  (Docs. 473, 474.)

Bowles states that he "is not currently seeking to disrupt this matter's settlement or final approval in its entirety."  (Doc. 468 at 3.)  Rather, he simply seeks to opt out of the settlement as a class member because he was "not provided proper notice of the class action settlement" and was unable to timely exclude himself from the settlement.  (*Id.*)  Alternatively, Bowles argues for his intervention in this action.

**A.    Summary of Arguments**

**1.    Bowles's Contentions**

Bowles explains that was employed by Leprino from January 20, 2004, until May 30, 2018.  In February 2019, he filed a wage and hour class action in King County against Leprino, *Bowles v. Leprino*, which was removed to this district in May 2019, and assigned Case. No. 1:19-cv-00635-JLT-BAM.  Thereafter, pursuant to stipulations with Leprino, the matter has been stayed pending resolution of the various cases associated with the *Vasquez* settlement.  (Doc. 468 at 4.)  Bowles and Leprino have been routinely updating the Court in that action, and on December 22, 2023, Leprino and Bowles filed a joint status report, signed by Bowles's counsel Kacey Cook, which stated that a motion for preliminary approval was pending in the *Vasquez* case.  Bowles received no further communication until March 26, 2024.  (*Id.*)  On March 27,

1   2024, the parties filed another joint status report, signed by Bowles's counsel Kacey Cook,

2   which stated that the parties in the Leprino Cases "agreed to a global settlement" and that"[t]he

3   Court granted preliminary approval of the settlement and notice has been sent to the class

4   members." (*Bowles v. Leprino*, 1:19-cv-00635-JLT-BAM, Doc. 59[8]; *see also* Doc. 473-1,

5   Declaration of Lisa Pooley ("Pooley Decl.") ¶ 14 and Ex. 18.)  Bowles's counsel reportedly

6   discovered that Phoenix "failed to obtain a current address" for Bowles and instead mailed the

7   *Vasquez* Class Notice to an address that had not been used or available to Bowles for

8   approximately six (6) years.  (Doc. 468 at 4.)  Bowles claims that Phoenix failed to provide

9   lawful notice and the failure was the result of a lack of due diligence to provide the best notice

10  practicable under the circumstances. Bowles contends that the best practicable notice under the

11  circumstances would have been for Leprino to have submitted the notice information to

12  Bowles's counsel, but Leprino chose not to do so.

13          Bowles notes that Phoenix stated in the declaration of Kevin Lee that it conducted a

14  National Change of Address search in an attempt to update the Class List.  Bowles asserts that

15  "[t]his simply did not occur."  (Doc. 468 at 6.)  Bowles further asserts that a subsequent skip

16  trace revealed that "it was very possible, in fact, quite easy, to determine [Bowles'] updated

17  address."  (*Id.*; *see also* Doc. 468-3, Declaration of Anthony Rogers ("Rogers Decl.") ¶ 3

18  ("ILYM Group was asked to perform a skip-trace on Steven Deruan Bowles, as requested by

19  Plaintiff Counsel.  This resulted in a current mailing address for this individual . . . .").)  Bowles

20  contends that if Phoenix had performed the duties outlined in the *Vasquez* settlement agreement,

21  then they would not have failed to notice him.  Bowles further contends that this failure raises

22  concerns for the settlement class as a whole and that "it is entirely possible, even likely, that at

23  least some of the current 3,438 class members . . . also did not receive lawful notice."  (Doc. 468

24  at 6.)  Bowles believes it is noteworthy that Phoenix reported only one request for exclusion and

25  no objections.  (*Id.*)

26          Bowles also notes that Leprino was aware that Bowles has been represented by counsel

27

28  [8] A court may take judicial notice of its own records in other cases.  *See United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980).

1    for the last five years, but Leprino nevertheless did not send the Class Notice to Bowles's

2    counsel.  Leprino also did not inform Bowles's counsel when the preliminary approval motion

3    had been granted, "which would have, at a minimum, allowed [Bowles'] counsel the opportunity

4    to communicate with Defendants regarding Mr. Bowles' opt out."  (*Id.* at 6-7.)  Bowles

5    additionally faults the parties for failing to file a Notice of Settlement in the *Vasquez* matter.

6         Bowles requests that he be allowed to opt-out of the *Vasquez* settlement to prevent

7    prejudice and to avoid the involuntary surrender of his rights.[9]  (*Id.* at 8.)  Alternatively, Bowles

8    claims, in a summary argument, that he should be allowed leave to intervene either as a matter of

9    right under Rule 24(a) or permissively under Rule 24(b).

10                    **2.  Leprino's Response**

11        As relevant here, Leprino contends that Bowles has known of *Vasquez* and other related

12   cases since 2019, observing that the Court related *Vasquez* to Bowles's action on September 11,

13   2019.  (*Bowles v. Leprino*, 1:19-cv-00635-JLT-BAM, Doc 22.)  Given this knowledge, Leprino

14   believes that Bowles easily could have followed the case developments on the Court's docket.

15        Further, while the *Bowles* action was stayed, Bowles and Leprino filed periodic status

16   reports in that action, which identified the global settlement in *Vasquez*.  For example, on

17   December 23, 2023, the parties filed a Joint Status Report, which states:

18            The parties in each of these earlier-filed cases[10] agreed to a global settlement of
             these cases. The Court ordered that these cases be consolidated under the *Vazquez*
19            case for purposes of settlement. Plaintiffs' Motion for Preliminary Approval of
             Class Action Settlement is pending.
20

21   (*Bowles v. Leprino*, 1:19-cv-00635-JLT-BAM, Doc. 58.)

22        On March 27, 2024, the parties filed a Joint Status Report, which states:

23

24

25   [9] Bowles is a member of the Settlement Class in this case (Doc. 468 at 5), and will not lose his rights
     under the Settlement Agreement.  Class Members are not required to submit a claim to receive their
26   settlement share.  (Settlement Agreement ¶ 36 ("'Participating Class Member' means any Class member
     who does not submit a timely and valid Request for Exclusion.") and ¶¶ 59, 66.)

27   [10] The cases are: (1) *Finder/Talavera*, Case No. 1:13-cv-2059-JLT-BAM; (2) *Perez*, Case No. 1:17-cv-
     00686-JLT-BAM; (3) *Vasquez*, Case No. 1:17-cv-00796-JLT-BAM; and (4) *Howell*, Case No. 1:18-cv-
28   01404-JLT-BAM.

The parties in each of these earlier-filed cases agreed to a global settlement of these cases and they have been consolidated under the *Vasquez* case for purposes of settlement. Th Court granted preliminary approval of the settlement and <u>notice has been sent to the class members</u>.

(*Bowles v. Leprino*, 1:19-cv-00635-JLT-BAM, Doc. 59 (emphasis added).)  Leprino asserts that despite these filings, Bowles never asked for additional information about the settlement, nor did he advise that he intended to opt out of the *Vasquez* settlement until after the deadline to do so. (Doc. 473 at 8.)

Leprino also contends that Bowles received the notice required by Rule 23 and due process, indicating that due process requires reasonable effort to inform affected class members through individual notice, but does not require actual notice.  (Doc. 473 at 8.)  Citing the declaration of Kevin Lee, Leprino states that the Settlement Administrator conducted a NCOA search to update Leprino's list of the last-known addresses of Class Members and then mailed the Notice to all Class Members. In addition, the Settlement Administrator performed skip trace searches on each class member whose Class Notice was returned as undeliverable in an effort to locate better addresses, and then re-mailed the Notice.  (*Id.* at 8-9.)

Leprino argues that Bowles baselessly asserts that the Settlement Administrator did not conduct the NCOA search and did not perform the duties outlined in the Settlement Agreement. Leprino further indicates that Bowles "ignores the difference between a NCOA search (which the Settlement Agreement and the Court's order required the Settlement Administrator to conduct for all Class Members before mailing the Notice) and a skip trace search (which the Settlement Administrator was to conduct only when it received undelivered Notices)." (Doc. 473 at 9.)  Further, Leprino asserts that the declaration of Anthony Rogers, who states that he conducted a skip trace on Bowles and found an address for him in Sanger, California (Doc. 468-3 at 2), does not show that the Settlement Administrator failed to follow the notice procedure. Leprino also points out that "Mr. Rogers did not state when he conducted this skip trace and cannot state what he would have found at any earlier point in time. Nor can he confirm Mr. Bowles' mailing address as of the date the Class Notice was mailed to Class Members."  (Doc. 473 at 9.)

31

Leprino argues that Bowles should not be allowed to opt out of the settlement belatedly because he knew about the global settlement and did not excuse himself before the deadline. Leprino also argues that Bowles' objection is inexcusably late and that he should not be permitted to intervene at this juncture.

### 3.  **Plaintiffs' Response**

Plaintiffs take no position on whether Bowles may exclude himself from the settlement, indicating that the dispute is between Bowles and Leprino.  (Doc. 474 at 2.)  However, Plaintiffs challenge Bowles's assertion that the notice process was deficient.  Plaintiffs posit that Bowles may not have updated his address with the United States Postal Service when he moved, meaning the NCOA search would not have been able to pick up his new address.  Plaintiffs indicate that any such failure cannot reasonably be attributed to other Class Members.  Plaintiffs also indicate that Bowles merely speculates that other members did not receive notice or that low rates of opt-outs might mean the notice was not delivered.

Plaintiffs submit an additional declaration from Phoenix case manager Kevin Lee.  Mr. Lee declares:

> 2.  On February 15, 2024, Phoenix received the Class Data from Defendant. Steven Bowles' name and his address in the form of a Post Office Box in Armona, California were on the Class List.

> 3.  On February 22, 2024, as directed by the Settlement Agreement and Release, Phoenix conducted a National Change of Address ("NCOA") database search of all addresses included on the Class List. As noted in my previous declaration, dated April 18, 2024, an NCOA search provides updated addresses for any individual who has moved in the previous four (4) years and notified the U.S. Postal Service of their address change.

> 4.  Steven Bowles' address was included in the NCOA database search conducted by Phoenix, and no updated address was returned by the U.S. Postal Service. Therefore, Phoenix mailed the Notice to the address for Steven Bowles as provided by Defendant on the Class List. A true and correct copy of the Notice mailed to Steven Bowles is attached hereto as Exhibit A.

> 5.  If Mr. Bowles had informed the U.S. Postal Service that he changed his address from the Post Office Box to another address more than four (4) years prior to the Notice date, the NCOA search would not have located an updated address for him.

> 6.  During the Notice Period and since then, Phoenix did not receive Mr. Bowles' Notice returned to our office as undeliverable. Should the Notice have been returned, Phoenix would have conducted a skip trace to obtain a more recent

1

2

address and would have re-mailed the Notice to any updated address obtained, as directed by the Settlement Agreement and Release.

3

4

5

(Doc. 474-1, Lee Suppl. Decl. ¶¶ 3-6.)  As of May 24, 2024, Phoenix had not been contacted directly by Bowles or any of his attorneys to communicate an address update or to indicate a desire for Bowles to be excluded from the Settlement.  (*Id.*, ¶ 7.)

6

7

8

Plaintiffs further argue that intervention would not be proper because of the late stage of the proceedings and because it would be deeply prejudicial to the 3,000+ Leprino employees who are awaiting their settlement proceeds.

9

**B.      Analysis**

10

**1.   Boyles's Objections Are Overruled**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Having considered Bowles's objections, and the parties' responses, the Court finds that Bowles's objections should be overruled for several reasons.  First, Bowles had constructive, if not actual knowledge, of the settlement.  The docket in *Bowles* reflects the global settlement in this action as of December 22, 2023.  Counsel for Bowles signed and filed a joint status report indicating that "Plaintiffs' Motion for Preliminary Approval of Class Action Settlement is pending."  (Doc. 473-1, Ex. 16.)  Bowles therefore had constructive notice of the settlement and his counsel (of which there are three) could have reviewed the settlement documents on this Court's docket, or asked for them from Leprino, which they did not do.  Further, the docket in *Bowles* reflects preliminary approval of the global settlement (and that class notice had been mailed) since at least March 27, 2024.  Counsel for Bowles signed and filed a joint status report indicating, "The Court granted preliminary approval of the settlement and <u>notice has been sent to the class members</u>."  (Doc. 473-1, Ex. 17 (emphasis added.)  By these filings, Bowles had actual knowledge of the global class action settlement.  Bowles or his counsel could have reviewed the Court's February 12, 2024 order granting preliminary approval, which contained information regarding the opt out procedure, identified the Settlement Administrator, and identified the revised class notice and where it could be located on the Court's docket. (*See* Doc. 461.) There is no indication that any of Bowles's attorneys undertook efforts to review those documents, or ask for the documents from Leprino, or ensure that Leprino had Bowles's current mailing address.

1   Indeed, none of Bowles's attorneys ever asked for defense counsel to send them the class

2   notice.[11] (Doc. 473-1, Pooley Decl. ¶ 17.)

3           Second, the declaration of Anthony Rogers provides no indication that the notice

4   procedures in this action were deficient.  As Leprino points out, the declaration does not

5   distinguish between a NCOA search, which the Settlement Agreement and the Court's order

6   required, and a skip trace search, which the Settlement Administrator was to conduct only when

7   it received undelivered Notices.  The declaration also provides no information regarding

8   Bowles's mailing address at the time notice was mailed, when or if Bowles updated his address

9   with the United States Postal Service, or when the skip trace was conducted.  As indicated by the

10  Settlement Administrator, during the Notice Period and since then, Phoenix did not receive Mr.

11  Bowles's Notice returned as undeliverable. If the Notice had been returned, Phoenix would have

12  conducted a skip trace to obtain a more recent address and would have re-mailed the Notice to

13  any updated address obtained.  (Lee Suppl. Decl. ¶ 6.)

14          Third, the notice procedure, which the Court approved, and the notice procedure

15  performed by the Settlement Administrator, are one in the same and the best practical under the

16  circumstances.  That Bowles may not have received the Notice does not mean that the notice

17  procedures were deficient.  The exact procedure, notice by mail at the address last known to

18  defendant and a skip trace search for each notice returned as undeliverable, has been approved by

19  the Ninth Circuit:

20          In this case, the Class Administrator . . ., sent the seven members whose notice was
            returned and never remailed fully descriptive notice by first-class mail to the
21          addresses last known to [defendant]. In addition, [the administrator] performed skip
            trace searches on each member whose notice was returned as undeliverable in an
22          effort to locate better addresses. These measures demonstrate a "reasonable effort"
            to ascertain the addresses of and send notice to the seven members at issue here.
23          Accordingly, those members received the "best notice that is practicable under the
            circumstances," Fed.R.Civ.P. 23(c)(2)(B), and are properly included in the class.
24

25  [11] At the hearing, Bowles's counsel argued that when she signed the March 26, 2024 joint status report,
    she had just returned to work after being hospitalized, and there was only a short time before the April 8,
26  2024 deadline to opt out.  The Court does not find this argument persuasive.  First, two additional
    attorneys represent Bowles such that counsel's illness is not an adequate excuse.  Second, the evidence
27  shows that Bowles's counsel first contacted Leprino's counsel about opting out on April 30, 2024, more
    than one month after filing the joint report acknowledging that preliminary approval had been granted and
28  notice had been sent to class members.  (Doc. 473-1, Pooley Decl. ¶ 15.)

1

2 *Rannis v. Recchia*, 380 F. App'x 646, 650 (9th Cir. 2010).  As explained by the Ninth Circuit,

3 the notice provided to a class certified under Rule 23(b)(3) (or to be certified for settlement under

4 Rule 23(b)(3)) must satisfy Rule 23(c)(2), which requires "the best notice that is practicable

5 under the circumstances." *Rannis*, 380 F. App'x 646, 650 (citing Fed .R. Civ. P. 23(c)(2)(B)).

6 "[I]t does not necessarily require that every in-state class member 'actually receive[ ]'" notice.

7 *Id.* (citing *Silber v. Mabon*, 18 F.3d 1449, 1453–54 (9th Cir.1994)). Due process "requires

8 reasonable effort to inform affected class members through individual notice, not receipt of

9 individual notice." *Id.*

10       The Court finds that the notice procedures, previously approved by the Court, (Doc. 461),

11 have been implemented and comply with Rule 23(c)(2)(B).  After receipt of the Class List with

12 the class members' last known addresses from Leprino, Phoenix conducted a NCOA search in an

13 attempt to update the mailing addresses as accurately as possible.  The database provided

14 updated addresses of any individual who had moved in the previous four (4) years and notified

15 the U.S. Postal Service of their change of address.  (Lee Decl. ¶ 4.)  Phoenix then mailed the

16 Class Notice to all 3,439 Class Members. (*Id.*, ¶ 5.)  Thirty-nine (39) Notices were returned, so

17 Phoenix performed a skip trace, and updated addresses were obtained for all 39 Class Members.

18 The Notice was re-mailed to those 39 class members.  As of April 18, 2024, no Notices were

19 considered undeliverable.  (*Id.*, ¶¶ 6-7.)  The Court finds that these measures demonstrate a

20 "reasonable effort" to ascertain the addresses of, and send notice to, the Class Members.

21       For these reasons, the Court finds that Bowles's objections are **OVERRULED**.

22               **2.  Boyles's Request for Intervention is Denied**

23       The Court similarly finds that Bowles's summary request for intervention should be

24 denied.

25       Boyles first requests intervention as of right. Intervention as a matter of right is governed

26 by Federal Rule of Civil Procedure 24(a), which provides that "[o]n timely motion, the court

27 must permit anyone to intervene who ... claims an interest relating to the property or transaction

28 that is the subject of the action, and is so situated that disposing of the action may as a practical

1    matter impair or impede the movant's ability to protect its interest, unless existing parties

2    adequately represent that interest." Fed. R. Civ. P. 24(a)(2).  A party seeking to intervene as a

3    matter of right must satisfy four requirements: (1) the applicant has a significant protectable

4    interest relating to the transaction that is the subject of the suit; (2) the disposition of the action

5    may impair or impede the applicant's ability to protect its interest; (3) the application is timely;

6    and (4) the existing parties may not adequately represent the applicant's interest. *Gonzalez v.*

7    *CoreCivic of Tennessee, LLC*, No. 16-cv-01891-DAD-JLT, 2018 WL 3689564, at *2 (E.D. Cal.

8    Aug. 1, 2018) (citing *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1177 (9th Cir. 2011)

9    and *United States v. City of Los Angeles*, 288 F.3d 391, 397 (9th Cir. 2002)).

10          Critically, Boyles does not attempt to show that the Plaintiffs in the consolidated Vasquez

11   case do not adequately protect his interest.  Indeed, he does not object to any of the terms of the

12   settlement or its recovery for Class Members.  The Court therefore finds that Boyles has not

13   satisfied the necessary requirements for mandatory intervention.

14          Bowles also requests permissive intervention.  Rule 24(b)(1) governs a party's request to

15   intervene by permission of the court. Rule 24(b)(1) provides that "[o]n timely motion, the court

16   may permit anyone to intervene who … has a claim or defense that shares with the main action a

17   common question of law or fact. Fed. R. Civ. P. 24(b)(1).  "[A] court may grant permissive

18   intervention where the applicant for intervention shows (1) independent grounds for jurisdiction;

19   (2) the motion is timely; and (3) the applicant's claim or defense, and the main action, have a

20   question of law or a question of fact in common." *Northwest Forest Resource Council v.*

21   *Glickman*, 82 F.3d 825, 839 (9th Cir. 1996). "Permissive intervention is committed to the 'broad

22   discretion' of the district court." *Greer v. County. of San Diego*, No. 19cv378-JO-DEB, 2023

23   WL 4479234, at *3 (S.D. Cal. July 10, 2023) (citation omitted).

24          "As with motions for intervention as of right, "[a] finding of untimeliness defeats a

25   motion for permissive intervention." *League of United Latin Am. Citizens v. Wilson*, 131 F.3d

26   1297, 1308 (9th Cir. 1997) (quoting *United States v. Washington*, 86 F.3d 1499, 1507 (9th Cir.

27   1996)).  In determining whether a motion to intervene is timely, courts weigh three factors: "(1)

28   the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other

36

1    parties; and (3) the reason for and length of the delay." *Zurich Am. Ins. Co. v. ACE Am. Ins. Co.*,

2    No. 11-cv-0881-KJM, , 2012 WL 3884695, at *2 (E.D. Cal. Sept. 6, 2012) (citation omitted); *see*

3    *also League of United Latin Am. Citizens*, 131 F.3d at 1308 (analyzing same three factors—the

4    stage of the proceedings, the prejudice to existing parties, and the length of and reason for the

5    delay—when considering permissive intervention).

6          Here, the late stage of the proceedings weighs strongly against intervention.  Boyles

7    waited to seek intervention until after the parties participated in mediation, after preliminary

8    approval, and at the eleventh hour before final approval.  Boyles made no efforts to intervene

9    despite his awareness of the parties' attempts at global settlement.  *In re Wachovia Corp. "Pick–*

10   *A–Payment" Mortg. Marketing and Sales Practices Litigation*, No. 5:09-md-02015-JF, 2011 WL

11   1877630, *6–7 (N.D.Cal.2011) (denying motion to intervene as untimely where it was filed on

12   the eve of the final approval hearing where action had been "litigated vigorously for almost four

13   years" and the settlement was "the product of months-long, arms-length negotiations").

14         Prejudice to other parties also weighs strongly against intervention.  As Plaintiffs point

15   out, intervention would be prejudicial to Leprino employees who are awaiting their settlement

16   proceeds.  The Leprino Cases have been heavily litigated for a decade and adding another party

17   potentially threatens resolution.  Likewise, as Leprino points out, given the many years of

18   litigation and the challenging efforts to reach a global settlement in the consolidated Vasquez

19   case, any delay caused by Bowles's intervention would prejudice and delay unduly the

20   adjudication of the original parties' rights.

21         Finally, the reason for and length of the delay also weighs against intervention.  Boyles has

22   known of this litigation since September 2019, when his case was related to the *Vasquez* action.

23   Boyles also has known of the parties' attempts at global resolution and the Court's grant of

24   preliminary approval. Boyles provides no justification for waiting until the eve of final approval

25   to seek intervention. The Court therefore concludes that the relevant factors weigh against

26   permissive intervention.

27         For these reasons, Bowles's request for intervention is **DENIED.**

28

**APPROVAL OF PAGA SETTLEMENT**

Under PAGA, an "aggrieved employee" may bring an action for civil penalties for labor code violations on behalf of himself and other current or former employees. Cal. Lab. Code § 2699(a). A plaintiff suing under PAGA "does so as the proxy or agent of the state's labor law enforcement agencies." *Arias v. Superior Ct.*, 95 Cal. Rptr. 3d 588, 600 (Cal. 2009). A PAGA plaintiff thus has "the same legal right and interest as state labor law enforcement agencies" and the action "functions as a substitute for an action brought by the government itself"; therefore, "a judgment in that action binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government." *Id.* A plaintiff bringing a representative PAGA action not only owes a duty to their "fellow aggrieved workers," but "also owes responsibility to the public at large; they act, as the statute's name suggests, as a private attorney general." *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133–34 (N.D. Cal. 2016).

Under PAGA, civil penalties collected are distributed between the aggrieved employees (25%) and the Labor and Workforce Development Agency ("LWDA") (75%). Cal. Lab. Code § 2699(i). Any settlement of PAGA claims must be approved by the court. Cal. Lab. Code § 2699(l)(2). The proposed settlement must also be sent to the agency at the same time that it is submitted to the court. Cal. Lab. Code § 2699(l)(2).

While PAGA requires a trial court to approve a PAGA settlement, district courts have noted there is no governing standard to review PAGA settlements. *Scott v. Blackstone Consulting, Inc.*, No. 21-CV-1470-MMA-KSC, 2024 WL 271439, at *8 (S.D. Cal. Jan. 24, 2024) (collecting cases).  District courts have applied "a Rule 23-like standard" asking whether the settlement of the PAGA claims is "fundamentally fair, reasonable, and adequate."  *Id.*

First, in accordance with the statutory requirements, Plaintiffs submitted the Settlement Agreement to the LWDA.  No comments from the LWDA were reported by Class Counsel or received by the Court, which supports final approval of the PAGA settlement.  *Conti*, 2023 WL 4600532, at *18 (E.D. Cal. July 18, 2023) (concluding that final approval of the PAGA settlement supported where no comments from the LWDA were reported by Class Counsel or received by

38

the Court).  The Settlement Agreement provides for a $10,000 PAGA Penalty. This amount represents less than 1 percent of the Maximum Settlement Amount.  However, district courts have approved a broad range of PAGA penalties.  *See Magadia v. Wal-Mart Assocs., Inc.*, 384 F. Supp. 3d 1058, 1101 (N.D. Cal. 2019) (collecting cases in which settlements providing for $10,000 in PAGA penalties were preliminarily or finally approved despite total settlement amounts of $900,000 and $6.9 million); *see also Alcala v. Meyer Logistics, Inc.*, No. CV 17-7211 PSG (AGRx), 2019 WL 4452961, at *9 (C.D. Cal. June 17, 2019) (collecting cases in which PAGA penalties within the zero to two percent range were approved by courts); *Scott*, 2024 WL 271439, at *8 (approving 5 percent PAGA settlement). Further, the Settlement Agreement provides that 75% of the PAGA Penalty will be paid to the LWDA and 25% will be paid to the PAGA Members, in accordance with California Labor Code § 2699(i). (Settlement Agreement ¶¶ 33-35.).  The Court finds approval of the PAGA settlement appropriate.

## REQUEST FOR ATTORNEYS' FEES

The Settlement Agreement provides that "Class Counsel will seek an award of attorneys' fees not to exceed forty percent (40%) of the Gross Settlement Sum, or One Million, Four Hundred Thousand Dollars and No Cents ($1,400,000.00)."  (Settlement Agreement ¶ 55.)   Class Counsel request an attorneys' fee award in the amount of $1,400,000, for 9,969.29 hours of work on the Leprino Cases for the last ten years.  (Doc. 462 at 26.)  The requested amount was preliminarily approved by the Court.  (Doc. 461.)

"In a certified class action, the court may award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "Where a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or the percentage-of-recovery method" when determining the reasonableness of a request for attorneys' fees. *In re Bluetooth*, 654 F.3d at 942; *Vizcaino*, 290 F.3d at 1047 (concluding district court has discretion in a common fund case to choose either the lodestar method or the percentage-of-the-fund method when calculating reasonable attorneys' fees). Under the percentage-of-recovery method, 25% of a common fund is the benchmark for fee awards. *See*, *e.g*., *In re Bluetooth,* 654 F.3d at 942 ("[C]ourts typically calculate 25% of the fund

as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure."). Under the lodestar method, a "lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *Id.* at 941 (citing *Staton,* 327 F.3d at 965). The product of this computation, the "lodestar" amount, yields a presumptively reasonable fee. *Gonzalez v. City of Maywood,* 729 F.3d 1196, 1202 (9th Cir. 2013); *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008). The Ninth Circuit has recommended that district courts apply one method but cross-check the appropriateness of the amount by employing the other as well. *See In re Bluetooth*, 654 F.3d at 944.

To support their claim for 40% of the Maximum Settlement Amount, Class Counsel argue: "The continued viability of wage-and-hour laws, like the viability of other remedial statutes, depends on the ability of private litigants to seek redress through litigation. The success of these lawsuits depends in part on the availability and willingness of attorneys to bring them. Substantial fee awards also encourage reputable law firms with skilled, capable attorneys to take the risk of serving as 'private attorneys general.'"  (Doc. 462 at 20.)  Class Counsel also argue that an upward adjustment of the 25% benchmark is warranted because of the "the results achieved and the difficulties attendant in litigating all of the Leprino Cases and the fact that Class Counsel took one all the way through a jury trial."  (*Id.* at 21.)

The percentage may be adjusted upward or downward based on (1) the results achieved; (2) the risks of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee; (5) the burdens carried by counsel; and (6) the awards made in similar cases. *Vizcaino*, 290 F.3d at 1048–50.

*Results Achieved*

Courts have recognized that the result achieved for the class is a major factor to be considered in making a fee award. *Hensley v. Eckerhart* 461 U.S. 424, 436 (1983); *Wilcox v. City of Reno*, 42 F.3d 550, 554 (9th Cir. 1994). The Ninth Circuit has observed that "[e]xceptional results are a relevant circumstance" to an adjustment from the benchmark award. *Vizcaino*, 290

40

1 | F.3d at 1048.

2 |       Class Counsel contend that the result obtained here is remarkable considering the current

3 | status of the cases.  The parties were in the midst of the *Vasquez* appeal, and absent counsel

4 | continuing to persist at the appellate, Leprino would not have been willing to settle and place any

5 | value on the Leprino Cases. As a result of the settlement, all of the Class Members will be

6 | provided with an automatic recovery.  (Doc. 462 at 22-23.)

7 |       The Court agrees that the result here is good.  Considering that the *Vasquez* on-call meal

8 | and rest break claim, which is the crux of the Leprino Cases, was soundly rejected by a jury, the

9 | result obtained is positive factor favoring an upward adjustment of the fee award.

10 |       *Risks of Litigation*

11 |       Risk is a relevant circumstance. *See In re Pac. Enter. Sec. Litig.*, 47 F.3d 373, 379 (9th

12 | Cir.1995) (holding fees justified "because of the complexity of the issues and the risks");

13 | *Vizcaino*, 290 F.3d at 1048 (finding case "extremely risky" when, among other factors, plaintiffs

14 | lost twice in district court and there was absence of supporting precedent). The risk of no

15 | recovery in a complex class action such as this is real.  Leprino contested liability and Class

16 | Counsel was aware that none of the cases would be resolved without an appeal.  (Doc. 462 at 21.)

17 | Given that the *Vasquez* case was unsuccessful before a jury, there was a concrete risk that

18 | subsequent juries in the other Leprino cases would reject Plaintiffs' claims.  This factor weighs in

19 | favor of an upward adjustment of the fee award.

20 |       *Skill and Quality of the Work*

21 |       The Court does not doubt Class Counsel are experienced and skilled litigators.  The Parris

22 | Law firm resume shows their extensive class action litigation experience.  (Doc. 462-1, Szeto

23 | Decl. ¶ 20, Ex. 11.)  As the Court indicated on preliminary approval, based on the Court's own

24 | experience and observations over the past decade, Class Counsel has shown competent, prepared,

25 | and zealous representation of class members.  Thus, this factor weighs slightly in favor of an

26 | upward deviation from the benchmark.

27 |       *Contingent Nature of the Fee and Burdens Carried*

28 |       "It is an established practice in the private legal market to reward attorneys for taking the

1    risk of non-payment by paying them a premium over their normal hourly rates for winning

2    contingency cases." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299

3    (9th Cir. 1994). Thus, whether counsel have taken the case on a contingency fee basis must be

4    considered when deciding to vary from the 25% benchmark. Here, Class Counsel took not one,

5    but six cases, on a contingency fee basis.  (Doc. 462 at 21.)  Thus, this factor weighs in favor of

6    an upward deviation from the benchmark.

7            *Burdens Carried by Class Counsel*

8            Class Counsel represent that they have devoted thousands of hours and advanced

9    significant sums in out-of-pocket expenditures, without compensation, in prosecuting the Leprino

10   Cases.  (Doc. 462 at 22.)   Relevant here, Class Counsel indicate that they incurred costs in an

11   amount in excess of $800,000.  (Doc. 462-1, Szeto Decl. ¶¶ 21-23, Ex. 12.)  These burdens weigh

12   in favor of an upward adjustment.

13           *Awards Made in Similar Cases*

14           As noted above, 25% is the Ninth Circuit's "benchmark award for attorney[s'] fees."

15   *Hanlon*, 150 F.3d at 1029.  Class Counsel request the Court enhance the fee award, citing cases in

16   which courts have awarded attorneys' fees at or above one third of the total settlement fund.

17   (Doc.  443, pp. 23-24.)  Plaintiffs cite cases in which many courts approved common fund fee

18   awards equivalent to or greater than the percentage requested here, and even when the award

19   resulted in a substantial multiplier. *See*, *e.g.*, *In re Pac. Enter. Sec. Litig.*, 47 F.3d at 379

20   (affirming an award equal to 33% of the common fund); *In re Ampicillin Antitrust Litigation*, 526

21   F. Supp. 494 (D.D.C. 1981) (45% of settlement fund); *Beech Cinema, Inc. v. Twentieth-Century*

22   *Fox Film Corp.*, 480 F. Supp. 1195 (S.D.N.Y. 1979), aff'd 622 F.2d 1106 (2nd Cir. 1980) (53%

23   of settlement fund); *Van Gemert v. Boeing Co.*, 516 F. Supp. 412, 420 (S.D.N.Y. 1981) (36% of

24   settlement fund).  (Doc.  462 at 24-25.)  Class Counsel argue that the 40% fee request is in line

25   with the customary fees awarded in similar cases given the amount of work Class Counsel

26   devoted on behalf of the Class, particularly in light of taking the *Vasquez* case to trial and

27   appealing the verdict, something that most plaintiffs' counsel would not have done.  (Doc. 462 at

28   25.)

1

2          **Lodestar Crosscheck**

3          Given that the percentage of the fund is above the benchmark, the Court conducted a

4   cursory lodestar cross check on preliminary approval and does so again here.  If a court applies

5   the percentage method, it then typically calculates the lodestar as a "cross-check to assess the

6   reasonableness of the percentage award." *See, e.g., Weeks v. Kellogg Co*., No. CV-09-8102-

7   MMM-RZx, 2013 WL 6531177, at *25 (C.D. Cal. Nov. 23, 2013); *Suarez v. Bank of Am., Nat'l

8   Ass'n*, No. 18-CV-01202-LB, 2024 WL 150721, at *3 (N.D. Cal. Jan. 11, 2024). To guard against

9   an unreasonable result, the Ninth Circuit has encouraged district courts to cross-check any

10  calculations done in one method against those of another method. *See Vizcaino*, 290 F.3d at

11  1050–51.

12         The "lodestar" approach calculates attorney fees by multiplying the number of hours

13  reasonably expended by a reasonable hourly rate. *Gonzalez*, 729 F.3d at 1202; *Camacho*, 523

14  F.3d at 978.  Where, as here, the lodestar is employed to cross-check a percentage-of-fund

15  determination, courts may do a rough calculation. *In re Toys R Us-Delaware, Inc.—Fair &

16  Accurate Credit Transactions Act (FACTA) Litig*., 295 F.R.D. 438, 460 (C.D. Cal. 2014).

17         As with their request for preliminary approval, Class Counsel has provided information

18  about the number of hours worked and the attorney hourly rates.  The Parris Law Firm has

19  devoted a total of 8,928.99 hours, which equates to a total lodestar of $3,571,596.00 at $400.00

20  per hour and $1,785,798.00 at $200.00 per hour. (Doc. 462-1, Szeto Decl. ¶ 11.)  The following

21  chart provides a breakdown of the 8,928.99 hours expended by the Parris Law Firm between each

22  of the Leprino Cases, as well as a lodestar calculation at hourly rates of both $400/hour and

23  $200/hour:

24

25

26

27

28

|  | Lodestar | | |
|---|---|---|---|
|  | **Hours** | **$400/Hour** | **$200/Hour** |
| **Vasquez** | 5,433.22 | $2,173,288.00 | $1,086,644.00 |
| **Perez** | 877.62 | $351,048.00 | $175,524.00 |

| | | | |
|---|---|---|---|
| **Howell** | 1,448.60 | $579,440.00 | $289,720.00 |
| **Walter** | 1,024.95 | $409,980.00 | $204,990.00 |
| **Finder/Talavera** | 144.60 | $57,840.00 | $28,920.00 |
| **TOTAL** | **8,928.99** | $3,571,596.00 | $1,785,798.00 |

(*See* Doc. 462-1, Szeto Decl. ¶ 11.)  The Downey Law Firm expended 1,040.3 hours, which equates to a total lodestar of 416,20.00 at $400 per hour and $208,060.00 at $200.00 per hour. (Doc. 462-2, Downey Decl. ¶ 5.)

As detailed on preliminary approval, in the Fresno Division of the Eastern District of California, attorneys with twenty or more years of experience are awarded $350.00 to $400.00 per hour. *See*, *e.g.*, *Leprino Foods Co. v. JND Thomas Co., Inc.*, No. 1:16-CV-01181-LJO-SAB, 2017 WL 128502, at *13 (E.D. Cal. Jan. 12, 2017), report and recommendation adopted in part, No. 1:16-CV-01181-LJO-SAB, 2017 WL 432480 (E.D. Cal. Feb. 1, 2017) (finding $400.00 per hour a reasonable hourly rate for attorney with more than thirty years of experience); *Sanchez v. Frito-Lay, Inc*., No. 1:14-CV-00797-AWI-MJS, 2015 WL 4662636, at *18 (E.D. Cal. Aug. 5, 2015), report and recommendation adopted, No. 1:14-CV-797-AWI-MJS, 2015 WL 5138101 (E.D. Cal. Aug. 26, 2015) (finding reasonable rate for attorney with twenty years of experience was $350 per hour in a wage and hour class action). Generally, "$300 is the upper range for competent attorneys with approximately a decade of experience." *Barkett v. Sentosa Props. LLC*, No. 1:14-CV-01698-LJO, 2015 WL 5797828, at *5 (E.D. Cal. Sept. 30, 2015) (O'Neill, J.) (citing *Silvester v. Harris*, No. 1:11-CV-2137 AWI SAB, 2014 WL 7239371, at *4 (E.D. Cal. Dec. 17, 2014). For attorneys with "less than ten years of experience ... the accepted range is between $175 and $300 per hour." *Silvester*, 2014 WL 7239371 at *4 (citing *Willis v. City of Fresno*, 1:09-cv-01766-BAM, 2014 WL 3563310 (E.D. Cal. July 17, 2014).

Recent cases have maintained the same hourly rates. *Accord Deerpoint Grp., Inc. v. Agrigenix, LLC*, No. 1:18-cv-00536-AWI-BAM, 2022 WL 16551632, at *19 (E.D. Cal. Oct. 31, 2022); *Langer v. Cooke City Raceway, Inc.,* No. 1:21-CV-01488-JLT-BAK, 2022 WL 2966172, at *16 (E.D. Cal. July 27, 2022), report and recommendation adopted, No. 1:21-cv-01488-JLT-

1  BAK, 2022 WL 3348015 (E.D. Cal. Aug. 12, 2022); *Webb v. County of Stanislaus,* No. 1:19-cv-

2  01716-DAD-EPG, 2022 WL 446050, at *6 (E.D. Cal. Feb. 14, 2022) ("In the Fresno Division of

3  the Eastern District of California, generally, attorneys with twenty or more years of experience

4  are awarded $325.00 to $400.00 per hour, attorneys with ten to twenty years of experience are

5  awarded $250.00 to $325.00, attorneys with five to ten years of experience are awarded $225.00

6  to $250.00, and less than $200.00 for attorneys with less than five years of experience.") Finally,

7  "[t]he current reasonable hourly rate for paralegal work in the Fresno Division ranges from $75 to

8  $150, depending on experience." *Silvester*, 2014 WL 7239371, at *4 (citations omitted); *cf.*

9  *Franco v. Ruiz Food Prods., Inc.*, No. 1:10-cv-02354-SKO, 2012 WL 5941801, at *20 (E.D. Cal.

10  Nov. 27, 2012) (approving a rate of "$100 per hour" for "legal assistants").

11  On preliminary approval, and without knowing which attorney performed which activity,

12  the Court made a downward adjustment of the rates for purposes of the lodestar calculation in

13  keeping with the rates in the Fresno District.  The Court therefore considered both an hourly rate

14  of $400 and $200.  (Doc. 461 at 35.)  The rates Plaintiffs now propose are in the range considered

15  by the Court on preliminary approval and are a downward adjustment from the hourly rates

16  originally requested.  The Court will continue to apply these downward-adjusted rates for

17  purposes of the lodestar calculation on final approval.

18  In addition, the Court must also consider the reasonable number of hours spent.  As stated,

19  the Parris Law firm worked 8,928.99 hours on the various Leprino Cases. (Doc. 462-1, Szeto

20  Decl. ¶ 11.) The Downey Law Firm, LLC worked 1,040.3 hours on the cases.  (Doc. 462-2,

21  Downey Decl. ¶ 5.)  The total number of hours worked on the Leprino Cases is 9,969.29 (Doc.

22  462 at 26.)  A review of the types of tasks performed substantiates the hours expended are

23  reasonable given the scope and breadth of the Leprino Cases.  (*See*, *e.g.*, Doc. 462-1, Szeto Decl.

24  Exs. 6-10.)

25  Therefore, a rough lodestar calculation using the Fresno area highest hourly rate, $400, for

26  the hours worked (9,969.29 hours) yields $3,987,716.00 in fees.  Using the lowest Fresno area

27  hourly rate, $200, yields $1,993,858.00. Thus, even using the downward adjustment to the hourly

28  rates, the lodestar exceeds the amount of fees requested by Class Counsel.  Consequently, the

1   lodestar cross-check supports a conclusion that the requested fees are reasonable.

2          Considering the relevant factors set forth above, along with the lodestar, the Court finds

3   that the request fees are reasonable.  Therefore, the request for attorneys' fees is **GRANTED** in

4   the amount of $1,400,000.00.

5                              <u>**REQUEST FOR COSTS**</u>

6          **I.      Litigation Expenses**

7          Rule 23(h) provides that, "[i]n a certified class action, the court may award reasonable

8   attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed.

9   R. Civ. P. 23(h). Counsel are entitled to reimbursement of the out-of-pocket costs they reasonably

10  incurred investigating and prosecuting the case. *See In re Media Vision Tech. Sec. Litig.*, 913 F.

11  Supp. 1362, 1366 (N.D. Cal. 1996) (citing *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 391–92

12  (1970)); *see also Staton*, 327 F.3d at 974.  The Ninth Circuit has held that an award to a

13  prevailing party "can include reimbursement for out-of-pocket expenses including ... travel,

14  courier and copying costs." *Grove v. Wells Fargo Fin. Cal., Inc*., 606 F.3d 577, 580 (9th Cir.

15  2010). Other recoverable expenses include expenses related to discovery and expenses related to

16  computerized research. *See Harris v. Marhoefer*, 24 F.3d 16, 19–20 (9th Cir. 1994) (noting that

17  "expenses related to discovery" are recoverable); *Trs. Of Constr. Indus. & Laborers' Health &*

18  *Welfare Trust v. Redland Ins. Co*., 460 F.3d 1253, 1258-59 (9th Cir. 2006) (holding that

19  "reasonable charges for computerized research may be recovered."); *Hartless v. Clorox Co.,* 273

20  F.R.D. 630, 646 (S.D. Cal. 2011) (holding that consulting fees as costs were reasonable because

21  the evidence was necessary to negotiate a settlement).

22         The Settlement Agreement provides that Class Counsel may seek "actual and reasonable

23  litigation costs and expenses not to exceed Eight Hundred Thousand Dollars and No Cents

24  ($800,000.00).  (Settlement Agreement ¶ 55.)  Pursuant to this provision, Class Counsel request

25  reimbursement of litigation costs and expenses in the total amount of $800,000 for the last ten

26  years, which they report is $65,762.88 less than the actual costs incurred by Class Counsel in the

27  Leprino Cases.  (Doc. 462 at 2, 30.)    The Parris Law Firm has incurred $784,225.19 in costs and

28  litigation expenses across all of the Leprino Cases.  (Doc. 462-1, Szeto Decl. ¶ 21.)  The Downey

46

1  Law Firm seeks reimbursement for its costs of $81,537.69 expended in prosecution of this action.

2  (Doc. 462-2, Downey Decl. ¶5 and Ex. C.)  The costs identified by Class Counsel total

3  $865,762.88,which includes fees for, among other things, research, travel, copying, and filing

4  fees.  (Docs. 462-1, Szeto Decl. ¶ 23 and Ex. 12.)

5       Given the length of time these cases have been pending, the extensive discovery and use

6  of experts, the jury trial in *Vasquez*, the Court finds the request reasonable.  The request for

7  litigation expenses and costs is **GRANTED** in the amount of $800,000.00.

8       **II.**     **Costs of Settlement Administration**

9       The parties agreed the Settlement Administrator shall receive a payment from the Gross

10  Settlement Fund as follows:

11-18       The Settlement Administrator will be paid for the reasonable costs of administration of the Settlement and distribution of payments from the Gross Settlement Fund, which Settlement Administration Costs shall not exceed Twenty Five Thousand Three Hundred Seventy Five Dollars and Ninety Four Cents. These costs, will include, inter alia, the required tax reporting on the Individual Settlement Payments and Individual PAGA Payments, the issuing of 1099 and W-2 IRS Forms, distributing Class Notices, creating and maintaining a web site and toll-free telephone number, calculating Individual Settlement Payments and Individual PAGA Payments, and distributing the Gross Settlement Fund as set forth herein, and providing necessary reports and declarations. These costs shall be paid from the Gross Settlement Fund. Any funds allocated to Settlement Administration Costs but not incurred by or otherwise paid to the Settlement Administrator will be included in the Net Settlement Amount and distributed pro rata to the Participating Class Members.

19  (Settlement Agreement ¶ 58.)

20       Phoenix has submitted an invoice indicating that it costs associated with the

21  administration of the matter are $25,375.94,which includes all costs to date, as well as estimated

22  costs involved in completing the Settlement distribution.  (Lee Decl. ¶ 14 and Ex. B (detailing

23  costs as $25,654.34).)  Based upon the information provided regarding the tasks performed by the

24  Settlement Administrator (*see generally* Lee Decl.) and the remaining responsibilities of the

25  Settlement Administrator, including issuance and mailing of settlement payments, the Court finds

26  the requested Settlement Administration costs reasonable.  Therefore, a payment of $25,375.94

27  for the Settlement Administrator from the Gross Settlement Fund is **APPROVED**.

28       **CLASS REPRESENTATIVE ENHANCEMENT PAYMENTS**

Plaintiffs request that the Court approve a Plaintiff Enhancement Payment, for their efforts in filing and prosecuting the Leprino Cases, in the total amount of $45,000, broken down as follows: Jerrod Finder ($5,000.00), Jonathan Talavera ($5,000.00), Isaias Vasquez ($10,000.00), Linda Hefke ($10,000.00), John Perez ($5,000.00), Andrew Howell ($5,000.00), and Fred Walter ($5,000.00).  (Doc. 462 at 31-32.)

A service award of $5,000 is presumptively reasonable.  *See Harris v. Vector Marketing Corp.*, No. C-08-5198 MEC, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012) (collecting cases). Incentive payments are to be evaluated individually, and the court should look to factors such as "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, ... the amount of time and effort the plaintiff expended in pursuing the litigation ... and reasonabl[e] fear[s of] workplace retaliation." *Staton*, 327 F.3d at 977 (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)); *see also Conti*, 2023 WL 4600532, at *28 (indicating court must consider "'the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, the amount of time and effort the plaintiff expended in pursuing the litigation,' and any financial or reputational risks the plaintiff faced." (citation omitted)).  Further, payments may recognize a plaintiff's "willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59.

**A. Time expended**

The Eastern District has awarded service payments for "substantial efforts taken as a class representative when the plaintiff has undertaken at least 30 to 40 hours of work." *Greer v. Dick's Sporting Goods, Inc.*, No. 2:15-cv-01063-KJM-CKD, 2020 WL 5535399, at *4 (E.D. Cal. Sept. 15, 2020) (internal quotation marks, citation omitted).  Here, Plaintiff Finder indicates that he has been actively involved in his case since 2013, he has assisted his attorneys throughout the last 10 years, and has "spent countless hours" assisting his attorneys with the case.  (Doc. 462-3, Finder Decl. ¶¶ 5, 7, 8.)  Plaintiff Talavera declares that he has been actively involved in his case since 2015, providing information and discovery responses, and sitting for his deposition, spending "time and effort over the last 6 years."  (Doc. 462-4, Talavera Decl. ¶¶ 4-7, 11.)  Plaintiff Vazquez declares that he has been actively involved in this case since it was filed, providing

48

information, assisting with discovery, sitting for his deposition, and playing a huge role when his case went to trial.  (Doc. 462-5, Vazquez Decl. ¶¶ 5-9.)  Plaintiff Hefke declares that she has been actively involved since 2017, providing information, assisting with discovery, sitting for her deposition twice, and attending trial in this case.  (Doc. 462-6, Hefke Decl. ¶¶ 5-9.)   Plaintiff Perez declares that he has been actively involved in his case since its filing, providing information, assisting in discovery, and sitting for his deposition.  (Doc. 462-7, Perez Decl. ¶¶ 4-7.)  Plaintiff Howell declares that he has been actively involved in this case since his lawsuit was filed, proving information, assisting with discovery, and having his deposition taken.  (Doc. 462-8, Howell Decl. ¶¶ 4-7.)  Plaintiff Walter declares that he has been actively involved in the case against Leprino since 2022, providing information, assisting with discovery, and appearing for his deposition.  (Doc. 462-9, Walter Decl. ¶¶ 4-7.)

Plaintiffs did not provide an estimate of the amount of time spent.  Nevertheless, given, the lengthy time span of the Leprino Cases, and the amount of time required to be expended, particularly by Plaintiffs Vasquez and Hefke in proceeding through trial, the Court finds that this factor weighs in favor of issuing service payments.

### B.  Actions taken to benefit the class

As discussed above, Plaintiffs all assisted with providing information, discovery, and appearing for their depositions.  Plaintiffs Vazquez, Hefke, Perez, Howell, and Walter, who were appointed Class Representatives in their cases, additionally declare that they performed tasks that included "seeking out and meeting with my attorneys to discuss the facts of the case," "reviewing documents," "providing deposition testimony," "reviewing written discovery," and "keeping in contact with [counsel] regarding the status of the lawsuit and providing . . . counsel with any information or documents they request."  (Vazquez Decl. ¶ 13; Hefke Decl. ¶ 13; Perez Decl. ¶ 11; Howell Decl. ¶ 11; Walter Decl. ¶ 11.)  Plaintiffs all were available by telephone for mediation and settlement discussions, spending time discussing the settlement with Class Counsel.  (Finder Decl. ¶ 9; Talavera ¶ 8; Vazquez Decl. ¶ 10; Hefke ¶ 10; Perez ¶ 8; Howell ¶ 8; Walter ¶ 8.)

By providing information to Class Counsel, assisting with discovery, and participating in

49

mediation, Plaintiffs' actions "undoubtedly benefitted Class Members," who will receive settlement payments. *Conti*, 2023 WL 4600532, at *29. This factor supports service awards.

### C. Workplace retaliation

Plaintiffs Finder, Talavera, Hefke, Perez, Howell, and Walter are former employees. (Finder Decl. ¶ 2; Talavera ¶¶ 2, 11; Hefke ¶¶ 2, 14; Perez ¶ 12; Howell ¶ 2; Walter ¶¶ 2, 12) Because these representatives are former employees, they cannot suffer workplace retaliation. *Conti*, 2023 WL 4600532, at *29 (former employees cannot suffer workplace retaliation). Plaintiff Vazquez currently works for Leprino but has not asserted any reasonable fear of workplace retaliation. (Vasquez Decl. ¶¶ 2, 14.) Taken together, this factor does not weigh in favor of service award for Plaintiffs.

### D. Reputational risk

Plaintiffs provide no information suggesting risk of reputational injury. This factor therefore weighs against service awards.

### E. Financial risk

Plaintiffs assumed financial risk in the event of a judgment (or judgments) in favor of Leprino. "Courts in the Ninth Circuit have repeatedly acknowledged such a financial risk supports an incentive payment to a class representative." *Conti*, 2023 WL 4600532, at *29 (collecting cases). Thus, this factor favors service payments to Plaintiffs.

### F. Willingness to act as private attorney general

The Ninth Circuit observed that incentive payments may recognize a class representative's "willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59. Here, Plaintiffs—at least at the mediation stage—acted as private attorney generals, which will result in payments to the LWDA and aggrieved employees under PAGA. Accordingly, this factor supports the requested service payments.

Considering the above factors, particularly the time expended and benefits to the Class, the Court finds service awards are supported. As to the requested amounts, Plaintiffs Finder, Talavera, Perez, Howell, and Walter seek service awards of $5,000.00 each, which is presumptively reasonable in the Ninth Circuit. *See Conti*, 2023 WL 4600532, at *30; *Harris*,

1  2012 WL 381202, at *7.  Plaintiffs Vazquez and Hefke seek service awards of $10,000.00 each.

2  A service award of $10,000.00 is less than 1% of the Gross Settlement Fund, which is less than

3  other service payments approved in this district. *Conti*, 2023 WL 4600532, at *31 (explaining

4  service award of approximately 1.2% of the gross settlement fund comparable to other service

5  payments). Further, Plaintiffs Vazquez and Hefke engaged in actions to benefit the class by

6  taking their case through to trial (albeit unsuccessfully), which supports a larger service fee award

7  based on the time and effort expended.  Thus, the request for Payment Enhancement Payments in

8  the total amount of $45,000.00 is **GRANTED**, allocated as follows:  Jerrod Finder ($5,000.00),

9  Jonathan Talavera ($5,000.00), Isaias Vasquez ($10,000.00), Linda Hefke ($10,000.00), John

10  Perez ($5,000.00), Andrew Howell ($5,000.00), and Fred Walter ($5,000.00).

11  **<u>CONCLUSION AND ORDER</u>**

12  Based on the foregoing, the Court finds the class settlement is fair, adequate, and

13  reasonable.  The factors set forth under Rule 23 weigh in favor of final approval of the settlement

14  agreement.  Accordingly, IT IS HEREBY ORDERED as follows:

15  1.  Objector Bowles's objections to the settlement are O VERRULED and his request

16  for intervention is DENIED.

17  2.  Plaintiffs' motion for final approval of class action settlement (Doc. 462) is

18  GRANTED.

19  3.  The Court finally approves the settlement of this class action in accordance with

20  the terms of the Settlement Agreement and finds that the Settlement Agreement, the Settlement

21  described therein, and the Maximum Settlement Amount of up to $3,500,000.00 ("Maximum

22  Settlement Amount") are fair, reasonable, and adequate in all respects pursuant to Rule 23(e) of

23  the Federal Rules of Civil Procedure.

24  4.  Certification of the Settlement Class is GRANTED, and the Court hereby certifies

25  the following Settlement Class for settlement purposes only:  All individuals who currently or

26  formerly worked at Leprino's Lemoore West, Lemoore East, or Tracy facilities in the State of

27  California as hourly, nonexempt employees at any time between November 15, 2009 and July 31,

28  2023.

5.      The Court finds that mailing of the Notice of Settlement (Doc. 462-10, Ex. A) in the manner provided in the Preliminary Approval Order fully and accurately informed all Settlement Class Members of the material elements of the proposed settlement, constitutes the best notice practicable under the circumstances, constitutes valid, due, and sufficient notice to all Settlement Class members and complies fully with the requirements of Federal law and United States Constitution.

6.      The Court further finds that the response of the Settlement Class to the Settlement supports settlement approval.  Of the 3,439 Class Members, only one timely elected to be excluded from the Settlement, only one Class Member filed a written objection (Bowles) or stated an intent to appear at the final approval hearing, and no Class Member challenged the data upon which their distribution would be determined.

7.      Pursuant to a timely filed Request for Exclusion, the following Class Member is excluded from the Settlement:  Sam Cam.

8.      In consideration and upon payment of the Enhancement Payments, Plaintiffs Jerrod Finder, Jonathan Talavera, Isaias Vasquez, Linda Hefke, John Perez, Andrew Howell, and Fred Walter will be deemed to have released all claims and waived their rights under Code of Civil Procedure Section 1542, including but not limited to a release of any and all claims under the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Family Medical Leave Act, Title VII of the Civil Rights Act, the California Fair Employment and Housing Act and the California Family Rights Act. Plaintiffs Jerrod Finder, Jonathan Talavera, Isaias Vasquez, Linda Hefke, John Perez, Andrew Howell, and Fred Walter also will be deemed to have waived the right to participate in, or to receive recovery from, any other representative action, class action or PAGA action brought by any other employee against any Released Party.

9.      Pursuant to Pursuant to California Private Attorney General Act ("PAGA"), California Labor Code section 2699(1)(2), Plaintiffs submitted to the California Labor and Workforce Development Agency the proposed settlement of this consolidate matter simultaneously with their Motion for Preliminary Approval, fulfilling the statutory requirements of section 2699.

10.     The Court finds and determines that Leprino's notice of Settlement to the Attorney General of the United States and the appropriate state official of each state in which a Class Member resides was timely, adequate, and compliant with the statutory requirements of the Class Action Fairness Act.  Accordingly, 28 U.S.C. § 1715(e) has no application to the settlement.

11.     The Court ORDERS the parties to effectuate the settlement terms as set forth in the Settlement Agreement.

12.     The Settlement Administrator, Phoenix Settlement Administrators, is directed to calculate and pay the claims of the Participating Class Members in accordance with the terms set forth in the Settlement Agreement.  The Settlement Administrator shall establish a Qualified Settlement Account ("QSA") and send the wire instructions to counsel for Defendants.

13.     The Court finds that, for settlement purposes only, the Settlement Class meets the requirements for certification under Rule 23 of the Federal Rules of Civil Procedure in that: (1) the Class is ascertainable and so numerous that joinder of all members of the Class is impracticable; (2) there are common questions of law and fact, and the questions of law and fact common to the Class predominate; (3) Plaintiffs' claims are typical of the claims of the members of the Class; (4) Plaintiffs will fairly and adequately protect the interests of the members of the Class; and (5) a class action is superior to other available methods for the efficient adjudication of the controversy.

14.     The PAGA award of $10,000.00 from the Gross Settlement Fund, which includes payment of $7,500.00 to California's Labor and Workforce Development Agency and the remainder distributed to aggrieved employees, is APPROVED. The Settlement Administrator shall issue the Labor & Workforce Development Agency Payment directly to the California Labor & Workforce Development Agency no later than five (5) calendar days after receipt of the Maximum Settlement Amount.

15.     The request for Plaintiff Enhancement Awards in the total amount of $45,000.00 is GRANTED, allocated as follows:  Jerrod Finder ($5,000.00), Jonathan Talavera ($5,000.00), Isaias Vasquez ($10,000.00), Linda Hefke ($10,000.00), John Perez ($5,000.00), Andrew Howell ($5,000.00), and Fred Walter ($5,000.00).  The Settlement Administrator shall issue the Plaintiff

53

1  Enhancement Payments directly to Plaintiffs no later than five (5) calendar days after receipt of

2  the Maximum Settlement Amount.

3        16.    Class Counsel's request for approval of attorneys' fees in the amount of 40% of

4  the Gross Settlement Fund in the total amount of $1,400,000.00 is GRANTED.  The Settlement

5  Administrator shall electronically wire the attorneys' fees to Class Counsel no later than five (5)

6  calendar days after receipt of the Maximum Settlement Amount.

7        17.    Class Counsel's request for litigation costs in the amount of $800,000 is

8  GRANTED.  The Settlement Administrator shall electronically wire the costs to Class Counsel no

9  later than five (5) calendar days after receipt of the Maximum Settlement Amount.

10        18.    Settlement Administration costs in the amount of $25,375.94 to be paid from the

11  Gross Settlement Fund are APPROVED.

12        19.    The Settlement Administrator shall disburse the Net Settlement Amount and

13  PAGA Payment to the Settlement Class Members and PAGA Members no later than five (5)

14  calendar days after receipt of the Maximum Settlement Amount.

15        20.    Class Counsel shall file a final report and declaration confirming distribution of

16  the Maximum Settlement Amount no later than **August 16, 2024**.

17        21.    The Court retains jurisdiction for purposes of resolving issues relating to the

18  interpretation, administration, implementation, effectuation, and enforcement of the Settlement.

19

20  IT IS SO ORDERED.

21      Dated:   __**June 17, 2024**__           ____/s/ *Barbara A. McAuliffe*____

22                                        UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28